**2025 IL 129965**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 129965)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
TYSHON THOMPSON, Appellant.

_Opinion filed June 26, 2025._


JUSTICE ROCHFORD delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Holder White, and Cunningham concurred in the judgment and opinion.

Justice Overstreet dissented, with opinion.

Justice O'Brien took no part in the decision.


## OPINION

¶ 1     Defendant, Tyshon Thompson, was convicted of violating section 24-1.6(a)(1), (a)(3)(A-5) of the aggravated unlawful use of a weapon statute (AUUW). 720 ILCS

5/24-1.6(a)(1), (a)(3)(A-5) (West 2020). On appeal, he claims the judgment must be reversed outright because he was convicted under a statute that is facially unconstitutional. Defendant asserts section 24-1.6(a)(1), (a)(3)(A-5) violates the second amendment (U.S. Const., amend. II) by categorically banning law-abiding citizens from openly carrying a handgun in public and enforcing an ahistorical double licensing process that mandates both a concealed carry license (CCL) and a Firearm Owner's Identification (FOID) card.

¶ 2 Defendant contends the appellate court committed reversible error when it upheld section 24-1.6(a)(1), (a)(3)(A-5) without applying the text-and-history test for assessing the constitutionality of modern firearm regulations as set forth in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). Defendant concludes section 24-1.6(a)(1), (a)(3)(A-5) fails the *Bruen* test because his public carriage of a ready-to-use handgun for self-defense is presumptively protected by the second amendment and there are no historical analogues to Illinois's double licensing regime for carrying firearms in public.

¶ 3 Although defendant is correct that his public carriage of a handgun is presumptively protected, *Bruen* itself stands for the proposition that Illinois's nondiscretionary, "shall-issue" firearm licensing regime does not violate the second amendment. For the following reasons, we hold that the AUUW statute's ban on unlicensed public carriage, coupled with the requirements to obtain CCLs and FOID cards, is not facially unconstitutional under the second amendment. We affirm the judgments of the Cook County circuit court and the appellate court, accordingly.

¶ 4          I. BACKGROUND

¶ 5 On the evening of March 25, 2020, an altercation at a gas station in Forest Park escalated into an exchange of gunfire between two vehicles on a highway. The police pulled over one of the vehicles and found defendant in the driver's seat and an uncased, loaded handgun inside the glove compartment. Chemical testing revealed gunshot residue on defendant's hands, and ballistics evidence established that the handgun was used in the shooting.

¶ 6 A Cook County grand jury indicted defendant on one count of AUUW, alleging that defendant

"carried on or about his person, in any vehicle, when not on his land or in his abode, legal dwelling or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, a handgun, pistol or revolver, and the handgun, pistol or revolver, possessed was uncased, loaded, and immediately accessible, and he had not been issued a currently valid license under the firearm concealed carry act, at the time of the offense, in violation of [section 24-1.6 of the Criminal Code of 2012 (720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2020))]."[1]

¶ 7 Defendant does not contest that he possessed the handgun within the vehicle while on the highway or that the handgun was uncased, loaded, and immediately accessible. Moreover, the State presented evidence at trial that, although defendant had been issued a valid FOID card at the time of the incident, he had not applied for a CCL. Defendant was convicted of AUUW and sentenced to 30 months in prison.

¶ 8 On appeal, defendant argued, *inter alia*, that the text-and-history standard set forth in *Bruen* establishes that section 24-1.6(a)(1), (a)(3)(A-5) impermissibly infringes on an individual's second amendment right to bear arms. 2023 IL App (1st) 220429-U, ¶ 51. Although defendant's conviction is based on possession of a handgun within a vehicle, he asserted the statute impermissibly criminalizes open carriage. *Id.*

¶ 9 The appellate court accepted defendant's framing of the issue as one of open carriage, rather than concealed carriage, but the court affirmed the AUUW conviction anyway. The court concluded that *Bruen* "explicitly held that open carry without a license was not mandated under the second amendment." *Id.* ¶ 58 (citing *Bruen*, 597 U.S. at 38 n.9). The appellate court stated: "Thus, the *Bruen* [C]ourt upheld Illinois's laws providing for a CCL application. Nothing in *Bruen* suggests that open carry is required under the second amendment." *Id.* The appellate court continued that, because Illinois's Firearm Concealed Carry Act (Concealed Carry

[1]Defendant was also indicted on two counts of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2020)), but those charges are not at issue in this appeal.

- 3 -

Act) (430 ILCS 66/1 *et seq.* (West 2020)) is not unconstitutional under *Bruen*, defendant's AUUW conviction for possession of a firearm within a vehicle without a CCL is not unconstitutional. 2023 IL App (1st) 220429-U, ¶ 60.

¶ 10   The appellate court also concluded that defendant lacks standing to challenge the constitutionality of the firearm licensing requirements because defendant did not submit to the challenged policy. *Id.* ¶ 59. The court noted that defendant did not offer any evidence that he attempted to apply for a CCL and was denied one. *Id.*

¶ 11   We granted defendant's petition for leave to appeal pursuant to Illinois Supreme Court Rule 315(a) (eff. Oct. 1, 2021), to consider his constitutional claim.[2] We also granted the Cook County State's Attorney's Office leave to submit a brief *amicus curiae* in support of the Attorney General's position, pursuant to Illinois Supreme Court Rule 345 (eff. Sept. 20, 2010).

¶ 12                                   II. ANALYSIS

¶ 13   Defendant renews his second amendment challenge to the AUUW statute (720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2020)) as impermissibly restricting law-abiding citizens' right to openly carry handguns in public and enforcing an ahistorical double licensing regime that mandates CCLs and FOID cards. Statutes are presumed constitutional, and the party challenging the constitutionality of a statute carries the burden of proving that the statute is unconstitutional. *People v. Aguilar*, 2013 IL 112116, ¶ 15. Moreover, this court has a duty to construe the statute in a manner that upholds the statute's validity and constitutionality, if reasonably possible. *Id.* The constitutionality of a statute is a question of law that we review *de novo*. *Id.*

¶ 14   Defendant mounts a facial challenge, which is the most difficult type of constitutional challenge. An enactment is invalid on its face only if no set of

---

[2]The State no longer disputes defendant's standing to raise his facial constitutional challenge. As standing is an affirmative defense and is forfeited when not raised, we need not consider it. *Stevens v. McGuireWoods LLP*, 2015 IL 118652, ¶ 22; see, *e.g.*, *People v. Kuykendoll*, 2023 IL App (1st) 221266-U, ¶ 17 (where the State initially argued that the defendant lacked standing because there was no evidence that he attempted to procure either a FOID card or CCL; however, at oral argument, the State conceded that defendant had standing).

- 4 -

circumstances exists under which it would be valid. *People v. One 1998 GMC*, 2011 IL 110236, ¶ 20. A facial challenge requires a showing that the statute is unconstitutional under any set of facts; the specific facts related to the challenging party are irrelevant. *People v. Garvin*, 219 Ill. 2d 104, 117 (2006).

¶ 15        As a threshold matter, we note that defendant, by mischaracterizing his firearm possession as open carriage, is attempting to challenge the constitutionality of a statute unrelated to his conviction. The State is correct that concealed carriage, not open carriage, is at issue because the AUUW provisions under which defendant was convicted do not implicate Illinois's ban on open carriage.

¶ 16        Open carriage of a ready-to-use firearm is illegal in Illinois, regardless of licensure. The unlawful use of a weapon (UUW) statute, for example, requires that a firearm be "carried or possessed in accordance with the Firearm Concealed Carry Act by a person who has been issued a currently valid license under the Firearm Concealed Carry Act." 720 ILCS 5/24-1(a)(10)(iv) (West 2020). To carry a firearm in accordance with the Concealed Carry Act, a licensee must completely or mostly conceal the firearm or carry it in a vehicle. 430 ILCS 66/5 (West 2020). (" 'Concealed firearm' means a loaded or unloaded handgun carried on or about a person completely or mostly concealed from view of the public or on or about a person within a vehicle."); *id.* § 10(c) (CCL licensee may carry concealed firearm).

¶ 17        Defendant's constructive possession of the handgun in the vehicle without a valid CCL constitutes unlicensed concealed carriage and is punishable under section 24-1.6(a)(1), (a)(3)(A-5). 430 ILCS 66/10 (West 2020) (CCL holder may keep or carry a loaded or unloaded concealed firearm on or about his person in a vehicle); 720 ILCS 5/24-1.6(a)(1) (West 2020) (a person commits AUUW when he or she knowingly "[c]arries *** in any vehicle" without a CCL). By contrast, a person who carries a firearm openly in public, with or without a CCL, commits UUW (720 ILCS 5/24-1(a)(10) (West 2020) but not AUUW (*id.* § 24-1.6(a)(1), (a)(3)(A-5)). Because defendant was convicted of violating section 24-1.6(a)(1), (a)(3)(A-5), the issue properly before the court is the constitutionality of the AUUW statute's enforcement of the CCL licensing regime, which incorporates FOID card licensure. See, *e.g.*, *People v. Chairez*, 2018 IL 121417, ¶ 13.

¶ 18        The Firearm Owner's Identification Card Act (FOID Card Act) authorizes a licensee to "acquire or possess any firearm." 430 ILCS 65/2(a)(1) (West 2020).

Every FOID card applicant "found qualified under Section 8 of [the FOID Card] Act by the Department *shall be entitled* to a [FOID card] upon the payment of a $10 fee." (Emphasis added.) *Id.* § 5(a). Section 8, in turn, provides, "The Department of State Police has authority to deny an application for or to revoke and seize a [FOID card] previously issued" if one of several objective factors, such as age or criminal history, disqualifies the person for FOID licensure. *Id.* § 8.[3]

¶ 19        For example, a FOID card applicant must submit proof that he or she is a citizen who has not been convicted of a felony and does not suffer from narcotics addiction or mental health issues. *Id.* § 4. The applicant must facilitate certain disclosures by "sign[ing] a release on a form prescribed by the Department of State Police waiving any right to confidentiality and requesting the disclosure to the Department of State Police of limited mental health institution admission information from another state." *Id.* § 4(a)(3). The applicant must also submit a photograph or seek a religious exemption from the photograph requirement. *Id.* § 4(a-20). The processing fee for a FOID card is $10. *Id.* § 5(a).

¶ 20        Only those who are at least 21 years old and who already possess or are applying for a FOID card may apply for a CCL. 430 ILCS 66/25(1), (2), 30(b)(4) (West 2020). However,

> "[t]he Department *shall issue* a [CCL] to an applicant *** if the person:
>
> ***
>
> *** has a currently valid [FOID card] and at the time of application meets the requirements for the issuance of a [FOID card] and is not prohibited under the [FOID Card Act] or federal law from possessing or receiving a firearm." (Emphasis added.) *Id.* § 25(2).

Thus, CCL licensure effectively incorporates FOID card licensure by reference, and the State must issue a CCL if the applicant meets the requirements of both the FOID Card Act and the Concealed Carry Act.

---

[3]Since the events at issue in this case, the Department of State Police has been officially renamed the Illinois State Police, and the language of the statutes has been updated accordingly. Pub. Act 102-538 (eff. Aug. 20, 2021); Pub. Act 102-813 (eff. May 13, 2022).

¶ 21 The application requirements of the Concealed Carry Act and the FOID Card Act are similar. For example, a CCL applicant must submit proof that he or she has not been convicted of a felony or certain other offenses. *Id.* §§ 25(3), 30(b)(5). An applicant must waive "privacy and confidentiality rights and privileges under all federal and state laws, including those limiting access to juvenile court, criminal justice, psychological, or psychiatric records or records relating to any institutionalization of the applicant." *Id.* § 30(b)(3). The applicant must submit his or her fingerprints if they are not already on file as part of the FOID card application. *Id.* § 30(b)(8).

¶ 22 The fee for a new CCL application by an Illinois resident is $150. *Id.* § 60(b). CCL applicants must also pay a fee for a criminal background check, including under the National Instant Criminal Background Check System of the Federal Bureau of Investigation. *Id.* § 35.

¶ 23 A significant difference between FOID card and CCL licensure involves firearms training. A CCL applicant must undergo at least 16 hours of firearms training and must submit a certificate of completion. *Id.* §§ 25(6), 30(b)(10), 75.

"A certificate of completion for an applicant's firearm training course shall not be issued to a student who:

(1) does not follow the orders of the certified firearms instructor;

(2) in the judgment of the certified instructor, handles a firearm in a manner that poses a danger to the student or to others; or

(3) during the range firing portion of testing fails to hit the target with 70% of the rounds fired." *Id.* § 75(e).

¶ 24 With this licensure framework in mind, we address whether the AUUW statute's prohibition of unlicensed concealed carriage in public is facially unconstitutional under the second amendment. The second amendment of our federal constitution states, in full, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II.

¶ 25    The United States Supreme Court explained in *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008), that the phrase "the right of the people to keep and bear Arms, shall not be infringed" sets out the "textual elements" of the clause that "guarantee the individual right to possess and carry weapons in case of confrontation." *Heller* interpreted the second amendment as codifying a preexisting individual right, unconnected with service in the militia (*id.* at 583-84), for "law-abiding, responsible citizens to use arms in defense of hearth and home" (*id.* at 635). Accordingly, individual self-defense is "the central component" of this second amendment right to keep and bear arms. (Emphasis omitted.) *Id.* at 599; *Bruen*, 597 U.S. at 29. Two years later, the Court applied its second amendment ruling in *Heller* to the states under the fourteenth amendment (U.S. Const., amend. XIV). *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).[4]

¶ 26    The second amendment has a "historically fixed" meaning (*Bruen*, 597 U.S. at 28), but "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791" (*United States v. Rahimi*, 602 U.S. 680, 691-92 (2024)). *Heller* held that applying the second amendment to modern firearms regulations "demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 597 U.S. at 19 (discussing *Heller*). Thus, *Heller* established a text-and-history standard for determining the scope of the second amendment. *Id.* at 19-21, 39. Many lower courts misinterpreted *Heller* by incorporating means-end scrutiny into their analyses. *Id.* at 18-20; *Range v. Attorney General United States*, 124 F.4th 218, 224 (3d Cir. 2024) (*en banc*). So, the *Bruen* Court explained that *Heller* had adopted a "methodology centered on constitutional text and history" rather than on strict or intermediate scrutiny. *Bruen*, 597 U.S. at 22; see *McDonald*, 561 U.S. at 790-91 (the second amendment does not permit "judges to assess the costs and benefits of firearms restrictions" under means-end scrutiny).

¶ 27    *Bruen* clarified and applied the text-and-history standard in the context of a second amendment challenge to New York's firearm licensing regime, which

---

[4]The United States Constitution's Bill of Rights applies to the states through the fourteenth amendment. *Bruen*, 597 U.S. at 37; *Ramos v. Louisiana*, 590 U.S. 83, 93 (2020) ("incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government"). So, defendant technically is asserting a violation of the fourteenth amendment, not the second. See *Bruen*, 597 U.S. at 37, 71.

regulated law-abiding citizens' ability to carry concealed firearms in public. *Bruen*, 597 U.S. at 11-12. Two citizens applied for unrestricted licenses to carry concealed handguns in public, and New York's licensing officials denied their applications. *Id.* at 15-16.

¶ 28 The New York regime made it a crime to possess a firearm without a license, whether inside or outside the home. But an individual who wished to carry a firearm outside the home could obtain an unrestricted license to " 'have and carry' " a concealed " 'pistol or revolver' " by proving that " 'proper cause exist[ed]' " for doing so. *Id.* at 12 (quoting N.Y. Penal Law § 400.00(2)(f) (McKinney 2022)). This "proper cause" requirement obligated the citizen to show a special need for self-protection distinguishable from that of the general community. Without showing a special need, citizens were banned from publicly carrying a firearm for self-protection against conflict. *Id.* Merely living in an area noted for criminal activity was not enough for a license; a citizen was required to show " ' "extraordinary personal danger" ' " with documented threats. *Id.* at 13 (quoting *In re Kaplan*, 673 N.Y.S.2d 66, 68 (App. Div. 1998), quoting 38 N.Y. Comp. Codes R. & Regs. tit. 38, § 5-03(b) (2012)).

¶ 29 The *Bruen* Court described New York's firearm licensing regulations as a " 'may issue' " regime that granted the government discretion to deny licenses based on a perceived lack of need or suitability. *Id.* at 13-14. In addition to New York, five states and the District of Columbia had "may issue" regimes that required citizens to show " 'proper cause' " to carry a handgun in public for self-protection. *Id.* at 15.

¶ 30 In contrast to "may issue" jurisdictions, 43 other states had what the Court described as " 'shall issue' " licensing regimes "where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Id.* at 13. The Court accurately identified Illinois's Concealed Carry Act as a "shall issue" licensing statute. *Id.* at 13 n.1.

¶ 31 *Bruen* emphasized that, when a court considers whether a modern firearm regulation violates the second amendment, judicial application of the text-and-history standard is mandatory:

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government *must* then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the second amendment's unqualified command." (Emphasis added and internal quotation marks omitted.) *Id.* at 24.

¶ 32    Thus, the text-and-history standard—adopted in *Heller* and clarified in *Bruen*—requires courts faced with second amendment challenges to "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 26. Applying the test to New York's licensing regime, the *Bruen* Court observed that the two applicants were within the second amendment's definition of "people" because there was no dispute that they were ordinary, law-abiding citizens. *Id.* at 31-32. The Court explained that the right to "bear" arms referred to the right to publicly wear, bear, or carry firearms " 'upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.' " *Id.* at 32 (quoting *Heller*, 554 U.S. at 584). In defining the right to "bear" as one of "public carry," the Court explained that people "keep" firearms in their homes but do not usually "bear" arms or carry them in their homes. *Id.* As the central component of the right is self-defense against confrontation, the Court stated, "confrontation can surely take place outside the home." *Id* at 32-33. The Court concluded that the second amendment's plain text presumptively guaranteed the applicants' right to bear arms in public for self-defense, not just at home. *Id.* at 33.

¶ 33    The *Bruen* Court held that the second amendment protected the applicants' right to public carriage unless the government could carry its burden to show that New York's proper-cause requirement was consistent with the nation's historical tradition of firearm regulation. *Id.* at 33-34. The government submitted a variety of historical precedents as evidence of the constitutionality of New York's concealed carry licensing regulations. *Id.* at 34. The Court categorized the precedents by historical period: "(1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries." *Id.* But the Court emphasized that the five categories did not deserve equal weight. Because the second amendment was adopted in 1791 and the fourteenth amendment was adopted in 1868, the Court

reasoned that historical precedent that long predates or postdates either time is less likely to reflect the understanding of the rights when the amendments were adopted. *Id.* at 34-36. Temporal proximity to the adoption of the second and fourteenth amendments provides a framework for assessing the precedents' relative weight because, "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 34.

¶ 34 The *Bruen* Court determined that none of the cited historical evidence established a tradition of broadly prohibiting the public carriage of commonly used firearms for self-defense as did New York's proper-cause requirement. *Id.* at 38-39. The Court explained that it was "not obliged to sift the historical materials for evidence to sustain" the challenged law, because that is the government's burden. *Id.* at 60.

¶ 35 *Bruen* teaches that courts are not tasked with addressing historical questions in the abstract. Instead, courts resolve the "legal questions presented in particular cases or controversies." *Id.* at 25 n.6. This legal inquiry is " 'a refined subset' " of a broader historical inquiry based on evidentiary principles and default rules to resolve uncertainties, such as the principle of party presentation, which entitles the courts to decide a case based on the historical record compiled by the parties. *Id.* (quoting William Baude & Stephen Sachs, *Originalism and the Law of the Past*, 37 L. & Hist. Rev. 809, 810 (2019)).

¶ 36 The *Bruen* Court undertook what it described as a "long journey through the Anglo-American history of public carry" to reach its conclusion that the government failed to prove that New York's proper-cause requirement was consistent with the second and fourteenth amendments. *Id.* at 70. The Court concluded that "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense" and have not required law-abiding, responsible citizens to demonstrate a special need for self-protection distinguishable from the general community to carry arms in public. *Id.* The *Bruen* Court held the proper-cause requirement is unconstitutional under *Heller*'s text-and-history standard because the regulation prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms. *Id.* at 39, 70.

¶ 37 Defendant cites *Bruen* for the proposition that the appellate court committed reversible error by omitting from its analysis any discussion of the constitutional text and regulatory history of shall-issue licensing regimes. Indeed, the United States Supreme Court has repeated that courts must apply *Heller*'s text-and-history standard to second amendment challenges to modern firearm regulations. *Id.* at 17 (when the plain text of the second amendment covers an individual's conduct "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation"); *Rahimi*, 602 U.S. at 692 (when analyzing firearm regulations under the second amendment, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit" (citing *Bruen*, 597 U.S. at 29)).

¶ 38 Defendant correctly observes that the *Bruen* Court undertook extensive analysis of the cited historical precursors as they related to New York's may-issue regime, without undertaking the same analysis for shall-issue regimes. See *Bruen*, 597 U.S. at 38-71. However, the *Bruen* Court went out of its way to address the precise issue presented in this appeal: whether shall-issue firearm licensing regimes, like those set forth in Illinois's Concealed Carry Act and FOID Card Act, comport with the second amendment.

¶ 39 The foundation of *Bruen*'s holding is the difference between the proper-cause requirements in may-issue licensing regimes and the objective requirements in shall-issue licensing regimes. Licensing decisions in shall-issue states, like Illinois, turn on objective criteria, not on a licensing official's subjective opinion or an applicant's showing of some additional need for self-defense. The *Bruen* Court expressly declared shall-issue licensing regimes facially constitutional under the second amendment *because* they neither give officials licensing discretion nor require the applicant to show an atypical need for self-defense:

> "To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit].' [Citation.] Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry. [Citation.] Rather, it appears that these shall-issue regimes,

- 12 -

which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' *Ibid.* And they likewise appear to contain only 'narrow, objective, and definite standards' guiding licensing officials [citation], rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion' [citation]— features that typify proper-cause standards like New York's. That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id.* at 38 n.9.

¶ 40 Defendant attempts to diminish the significance of the above-quoted language because it appears in a footnote. However, "the location, whether in the text or in a footnote, of something which the writer of an opinion thinks should be said, is a matter of style which must be left to the writer." *Phillips v. Osborne*, 444 F.2d 778, 782 (9th Cir. 1971).

¶ 41 Moreover, in case there was any doubt about the Court's view of the constitutional validity of shall-issue licensing regimes, Justice Kavanaugh reinforced the majority opinion by elucidating the crucial difference between proper-cause and shall-issue regulations:

"First, the Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense. In particular, the Court's decision does not affect the existing licensing regimes—known as 'shall-issue' regimes—that are employed in 43 States.

The Court's decision addresses only the unusual discretionary licensing regimes, known as 'may-issue' regimes, that are employed by 6 States including New York. As the Court explains, New York's outlier may-issue regime is constitutionally problematic because it grants open-ended discretion to licensing officials and authorizes licenses only for those applicants who can show some special need apart from self-defense. Those features of New York's regime—the unchanneled discretion for licensing officials and the special-need requirement—in effect deny the right to carry handguns for self-defense to many 'ordinary, law-abiding citizens.' [Citations.] The Court has held that

'individual self-defense is "the central component" of the Second Amendment right.' [Citation.] New York's law is inconsistent with the Second Amendment right to possess and carry handguns for self-defense.

By contrast, 43 States employ objective shall-issue licensing regimes. Those shall-issue regimes may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements. [Citation.] Unlike New York's may-issue regime, those shall-issue regimes do not grant open-ended discretion to licensing officials and do not require a showing of some special need apart from self-defense. As petitioners acknowledge, shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice. [Citation.]

Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so. Likewise, the 6 States including New York potentially affected by today's decision may continue to require licenses for carrying handguns for self-defense so long as those States employ objective licensing requirements like those used by the 43 shall-issue States." (Emphases omitted.) *Bruen*, 597 U.S. at 79-80 (Kavanaugh, J., concurring, joined by Roberts, C.J.).

¶ 42    Thus, the United States Supreme Court expressly held in *Bruen* that shall-issue firearm licensing regimes, like the one enacted in Illinois, comport with the second amendment because they do not contain the problematic features of New York's licensure regime—the unchanneled discretion for licensing officials and the special-need requirement—which effectively deny the right to carry handguns for self-defense to many ordinary, law-abiding citizens. Illinois's CCL and FOID card regulations do not have a special-need requirement and contain only narrow, objective, and definite standards guiding licensing officials rather than requiring the appraisal of facts, the exercise of judgment, and the formation of an opinion. Contrary to defendant's assertion, *Bruen*'s juxtaposition of may-issue and shall-issue regimes was deliberate, and it illustrates why the former are facially unconstitutional and the latter are not. *Id.* at 80 ("States that employ objective shall-

- 14 -

issue licensing regimes for carrying handguns for self-defense may continue to do so.").

¶ 43    Consistent with *Bruen*, we hold that, when the second amendment's plain text covers an individual's conduct, that conduct is presumptively protected. The State must then justify its regulation by demonstrating that it is consistent with this nation's historical tradition of firearm regulation.

¶ 44    Here, defendant's possession of a ready-to-use firearm in his vehicle constitutes public concealed carriage, which is presumptively protected under *Bruen*. See *People v. Burns*, 2015 IL 117387, ¶ 21 (second amendment prohibits absolute ban on carrying ready-to-use guns outside the home for self-defense). However, under the unique circumstances presented here, the United States Supreme Court's express endorsement of shall-issue licensure obviates the need for this court to apply the historical-tradition component of the *Bruen* analysis to defendant's facial challenge to section 24-1.6(a)(1), (a)(3)(A-5) and its enforcement of CCL and FOID card licensure.

¶ 45    Defendant seeks reversal based on the appellate court's failure to undertake the text-and-history analysis, arguing that *Bruen*'s invalidation of may-issue licensure is simply not relevant to shall-issue licensure. However, *Bruen* itself demonstrates that applying the text-and-history standard to Illinois's shall-issue regime is unnecessary. Specifically, *Bruen* advises that the constitutional defects of a may-issue regime can be cured by stripping the statute of its problematic features, which are what distinguish may-issue regimes from shall-issue regimes in the first place. *Bruen*, 597 U.S. at 80 (states affected by the *Bruen* decision may continue to require licenses for carrying handguns for self-defense so long as the states employ objective licensing requirements). Defendant's ultimate argument is that Illinois's shall-issue regime is unconstitutional. But one cannot reconcile his position with *Bruen*'s pronouncement that a may-issue regime will pass constitutional muster if it is amended to operate like a shall-issue regime. For the reasons expressed in *Bruen*, Illinois's shall-issue regime does not violate the second amendment.

¶ 46    We note that our interpretation of *Bruen* is consistent with appellate court decisions that have cited footnote 9 correctly for the proposition that Illinois's shall-issue licensing regulations are not facially unconstitutional under the second amendment. See, *e.g.*, *People v. Gunn*, 2023 IL App (1st) 221032, ¶ 28 (Concealed

Carry Act's 90-day waiting period and 5-year validity period are constitutional); *People v. Burns*, 2024 IL App (4th) 230428, ¶¶ 37, 41; *People v. Harris*, 2024 IL App (1st) 230122-U, ¶¶ 44, 48 ("We reject defendant's contention that the AUUW statute is unconstitutional on its face due to the statutory schemes for the issuance of a FOID card and a CCL when the *Bruen* [C]ourt endorsed such regulations."); *People v. Noble*, 2024 IL App (3d) 230089, ¶ 16; *People v. Paramo*, 2024 IL App (1st) 230952-U, ¶ 39 (*Bruen* explicitly recognized that "shall-issue" licensing regimes such as Illinois's FOID Card Act were permissible under the second amendment).

¶ 47    We also distinguish this decision from *Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023), where the Seventh Circuit Court of Appeals reached a different result on a similar issue. *Atkinson* involved a second amendment challenge to a federal "felon-in-possession" statute (*id.* at 1019) that banned gun possession by anyone who has been convicted in any court of " 'a crime punishable by imprisonment for a term exceeding one year' " (*id.* at 1022 (quoting 18 U.S.C. § 922(g)(1) (2018)). Atkinson argued the statute was unconstitutional as applied to him because his felony conviction of mail fraud was 24 years old and he otherwise had a clean record. *Id.* at 1021-22. The government cited *Bruen*'s footnote 9 as part of its basis to bypass the text-and-history analysis. *Id.* at 2022. The Seventh Circuit stated the text-and-history test was necessary because the constitutionality of barring felons from possessing firearms was not addressed by *Bruen*. However, the Seventh Circuit conceded our point that "the [*Bruen*] Court seemed to find no constitutional fault with a state requiring a criminal background check before issuing a public carry permit." *Id.* Therefore, *Atkinson* does not support defendant's assertion that the appellate court erred in declining to apply the text-and-history standard here.

¶ 48    Defendant alternatively argues that Illinois's firearm licensure is not really a shall-issue regime at all, because the Concealed Carry Act gives the government too much discretion to deny applications. First, he contends the firearms training requirement for a CCL allows the government to deny licensure by arbitrarily withholding a certificate of completion. However, defendant concedes that the Concealed Carry Act provides an "objective description of the required training" and provides that instructors "shall" issue certificates when the required training has been completed or satisfied. 430 ILCS 66/75 (West 2020). Furthermore, the *Bruen* Court expressly authorized requirements for training in firearm handling to

ensure that the applicant is, in fact, responsible and law-abiding. *Bruen*, 597 U.S. at 38 n.9 (majority opinion).

¶ 49 Second, defendant contends the regime is impermissibly discretionary because any law enforcement agency may object to a CCL application based on a reasonable suspicion that the applicant is a danger to himself or herself or others, or a threat to public safety. 430 ILCS 66/15(a) (West 2020). An objection tolls the 90-day period for the Department of State Police to issue or deny the license until a review on the objection is completed and a decision is issued. 430 ILCS 66/15(b) (West 2020). However, as in the case of firearm training, *Bruen* permits mental health checks to ensure that the applicant is not a threat to harm himself or herself or others. The checks do not require the applicant to show a special need for armed self-defense. *Bruen*, 597 U.S. at 38 n.9.

¶ 50 Third, defendant asserts section 24-1.6(a)(1), (a)(3)(A-5) nevertheless violates the second amendment because requiring the dual issuance of a FOID card and a CCL is distinguishable from the shall-issue regimes discussed in *Bruen*. He claims that only about one-third of Illinoisans who possess FOID cards undertake the application process for a CCL. He claims, "Illinoisans want to legally carry ready-to-use handguns outside the home for self-defense but are unable to afford the timely and costly CCL application process and most of the time only undergo the FOID process." The fees and approval process to obtain a CCL comport with the second amendment because they do not require applicants to show an atypical need for armed self-defense and are designed to ensure that only those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens. See *Id.* at 80 (Kavanaugh, J., concurring, joined by Roberts, C.J.). Illinois's licensure regime does not operate like the may-issue regimes declared facially unconstitutional in *Bruen*. The processing of any given application in Illinois might give rise to an as-applied challenge but not a facial challenge like the one defendant raises here. See *id.* ("[S]hall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice.").

¶ 51 Finally, defendant points to states that allow unlicensed concealed carriage or that recognize vehicle exceptions to carriage restrictions. However, another state's legislative decision to relax or eliminate licensure does not render Illinois's regime

facially unconstitutional under the second amendment.

¶ 52                    III. CONCLUSION

¶ 53    When the second amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct, and the State must then justify its restriction by demonstrating that it is consistent with this nation's historical tradition of firearm regulation. Defendant's possession of a handgun within his vehicle constitutes concealed carriage and is presumptively protected. Ordinarily, the government then would need to affirmatively prove that its modern firearms regulations are part of the historical tradition that delimits the outer bounds of the right to keep and bear arms. However, *Bruen*'s express endorsement of shall-issue licensure obviates the need for this court to apply the historical-tradition component of the *Bruen* analysis to defendant's facial challenge to the enforcement of CCL and FOID card licensure through section 24-1.6(a)(1), (a)(3)(A-5). For the reasons expressed in *Bruen* itself, Illinois's shall-issue regime is not facially unconstitutional under the second amendment.

¶ 54    Judgments affirmed.

¶ 55    JUSTICE OVERSTREET, dissenting:

¶ 56    I respectfully disagree with my colleagues' conclusion that, in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022), the United States Supreme Court "expressly" held that shall-issue firearm licensing regimes, like Illinois's firearm licensing requirements, pass constitutional muster under second amendment (U.S. Const., amend. II) standards. On the contrary, I believe the majority's conclusion contradicts the *Bruen* Court's express holding, which sets out the required analysis for resolving defendant's constitutional claim. Accordingly, I dissent.

¶ 57    The issue before this court is defendant's facial constitutional challenge to section 24-1.6(a)(1), (a)(3)(A-5) of the Criminal Code of 2012, which defines the offense of aggravated unlawful use of a weapon (AUUW) (720 ILCS 5/24-

- 18 -

1.6(a)(1), (3)(A-5) (West 2020)). A jury found that defendant committed this criminal offense by having a loaded, immediately accessible handgun in his vehicle at a time when he had not been issued a then-valid concealed carry license (CCL) under Illinois's Firearm Concealed Carry Act (Concealed Carry Act) (430 ILCS 66/1 *et seq.* (West 2016)).[5] Defendant challenged his conviction on direct appeal by asserting that the conviction violates his second amendment rights.

¶ 58        The appellate court affirmed defendant's conviction, concluding that Illinois's firearm licensing scheme is permissible under the second amendment standards set out in *Bruen*. Specifically, the appellate court interpreted footnote 9 of the *Bruen* decision as explicitly upholding Illinois's Concealed Carry Act under second amendment standards. 2023 IL App (1st) 220429-U, ¶ 58. The majority agrees with this interpretation of *Bruen*'s footnote 9. However, I dissent from the majority's opinion because I believe the majority has reached an incorrect and unsupported conclusion with respect to the significance of footnote 9 in *Bruen*. My interpretation of *Bruen* is founded in the elementary principle that, when our country's highest court issues crucial, landmark rulings that define the basic meaning of our Bill of Rights, it does so with clear, direct, and express language, not with hints or indirect suggestions hidden in a vague footnote in a case where the issue was not raised. See *District of Columbia v. Heller*, 554 U.S. 570, 625 n.25 (2008) ("It is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a footnoted *dictum* in a case where the point was not at issue and was not argued."). Accordingly, I believe the majority has resolved defendant's constitutional challenge in this appeal by reading a holding into *Bruen*'s footnote 9 that simply does not exist.

¶ 59        The second amendment of our federal constitution endows all citizens with the fundamental right to keep and bear arms, and this right to do so plays a vital role in "our system of ordered liberty." *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010). The right codified in the second amendment is deeply rooted in American

---

[5]The Concealed Carry Act incorporates the additional requirement of a firearm owner's identification (FOID) card under the Firearm Owner's Identification Card Act (430 ILCS 65/0.01 *et seq.* (West 2020)). As the majority notes, the State presented evidence that, at the time of the AUUW offense, defendant had been issued a valid FOID card but had not applied for a CCL.

history, and we inherited this right from our English ancestors. *Bruen*, 597 U.S. at 39.

¶ 60  The second amendment states, in full, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. The right to "bear arms" refers to the right to carry a weapon "for the purpose *** of being armed and ready for offensive or defensive action in a case of conflict with another person." (Internal quotation marks omitted.) *Heller*, 554 U.S. at 584.

¶ 61  The second amendment is simple in language terms, but its application in the face of modern challenges has been anything but simple, as the amendment's scope remains fiercely contested. This is true because the right to keep and bear arms is not a right without limitations. *Bruen*, 597 U.S. at 21; *United States v. Rahimi*, 602 U.S. 680, 690-91 (2024). Although the second amendment has a "historically fixed" meaning, the amendment allows more than just the firearm regulations that existed in 1791. *Bruen*, 597 U.S. at 28; *Rahimi*, 602 U.S. at 691-92.

¶ 62  Applying the second amendment's historical scope to "novel modern conditions can be difficult and leave close questions at the margins." (Internal quotation marks omitted.) *Bruen*, 597 U.S. at 31. Contemporary courts are charged with the challenging task of "consideration of modern regulations that were unimaginable at the founding." *Id.* at 28. "The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 27. Nonetheless, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 28.

¶ 63  In *Heller*, the United States Supreme Court made its first effort to reconcile modern firearm regulations with the right embodied within the language of the second amendment. To guide lower courts facing second amendment challenges to modern firearm regulations, the *Heller* Court defined specific considerations the courts must consider when addressing the scope of the second amendment in light of such challenges, holding that the proper analysis "demands a test rooted in the Second Amendment's *text*, as informed by *history*." (Emphases added.) *Id.* at 19 (discussing *Heller*). The *Heller* Court, therefore, established a text-and-history standard for determining the scope of the second amendment. *Id.* at 19-21, 39.

Applying this standard, the *Heller* Court held that the second amendment guarantees an individual right to keep and bear arms unconnected to miliary service and that this right applied to ordinary citizens within their homes. *Heller*, 554 U.S. at 583-84, 635. *Heller* was the Court's first in-depth examination of the scope of the second amendment. *Id.* at 635.

¶ 64 Following *Heller*, many lower courts incorrectly applied *Heller*'s text-and-history standard by including means-end scrutiny in their second amendment analyses. *Bruen*, 597 U.S. at 18-20; *Range v. Attorney General United States*, 124 F.4th 218, 224 (3d Cir. 2024) (*en banc*) (explaining how the courts misread a passing comment in *Heller*, which indicated that the challenged statute in *Heller* would be unconstitutional under any standard of scrutiny). Therefore, in *Bruen*, the Court set out to make *Heller*'s text-and-history standard more explicit to eliminate this misunderstanding. *Bruen*, 597 U.S. at 18-24, 31 (noting the lower courts' error in applying *Heller* and underscoring that it presented a detailed explanation of the text-and-history standard in *Bruen* to make the standard "endorsed in *Heller* more explicit").

¶ 65 The *Bruen* Court's occasion to expand on its discussion of this text-and-history standard arose in the context of a constitutional challenge by two citizens to New York's firearm licensing regulations, called the "Sullivan Law" (1911 N.Y. Laws 442), which regulated law-abiding citizens' ability to carry firearms in public. *Bruen*, 597 U.S. at 11-12. As noted by the majority in the present case (see *supra* ¶ 29), the Court identified New York's licensing statute as a "may issue" scheme that granted government authorities discretion to deny licenses based on a perceived need or suitability. *Bruen*, 597 U.S. at 13-15. At the time, New York, five other states, and the District of Columbia had "may issue" licensing schemes that required citizens to show "proper cause" to be able to carry a handgun in public for self-protection. *Id.*

¶ 66 To draw a contrast between New York's firearm licensing regulations that were at issue in *Bruen* against some of the other states' approach to firearm licensing, the *Bruen* Court identified 43 states that had what it described as "shall issue" licensing regulations "where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or

suitability." *Id.* at 13. The Court identified Illinois's Concealed Carry Act as one of the "shall issue" licensing statutes. *Id.* at 13 n.1.[6]

¶ 67 Under New York's licensing scheme at issue in *Bruen*, an individual who wanted to carry a firearm outside his or her home could obtain an unrestricted license to " 'have and carry' " a concealed handgun only if that individual could prove that " 'proper cause exist[ed]' " for doing so (*id.* at 12) (quoting N.Y Penal Law § 400.00(2)(f) (McKinney 2022)), which required a showing of a special need for self-protection distinguishable from that of the general community. In *Bruen*, the United States Supreme Court was asked to determine whether New York's modern firearm licensing scheme passed constitutional muster under second amendment standards. *Id.* at 16-17.

¶ 68 The *Bruen* Court emphasized, expressly and in no uncertain terms, that when courts are faced with this constitutional question, the courts *must* apply the text-and-history analysis established in *Heller*. *Id.* at 24 (When the second amendment's plain text covers an individual's conduct, "[t]he government *must* then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." (Emphasis added.)). The *Bruen* Court expressly stated that it is only *after* the government meets its burden under the text-and-history test "may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.*

¶ 69 In *Bruen*, the Court explicitly demonstrated how the text-and-history standard applies by undertaking this analysis to determine the constitutionality of New York's licensing regulations. The Court first applied the text prong of the standard and concluded that the second amendment's plain text presumptively guaranteed the citizens' right to bear arms in public for self-defense, not just at home as established in *Heller*. *Id.* at 33. Having concluded that New York's licensing scheme burdened the two complaining citizens' second amendment rights, the Court then turned to the historical prong of the standard, noting that the burden fell squarely on the government to show that New York's "proper-cause" requirement

---

[6]The Court identified these "shall issue" licensing regimes merely as a descriptive contrast to the statute that was at issue in *Bruen*; the Court did *not* apply the required text-and-history standard to any of the identified shall-issue statutes to determine their constitutionality, as that issue was not before the Court in *Bruen*.

was consistent with our country's historical tradition of firearm regulation. *Id.* at 33-34. The Court again emphasized that the citizens' right to publicly carry is protected by the second amendment *unless* the government can carry its burden. *Id.* at 34.

¶ 70 In an effort to meet their burden with respect to the historical prong of this standard, the government respondents in *Bruen* directed the Court to consider an extensive array of historical precedents that spanned five different time periods, from medieval times to the late nineteenth and early twentieth centuries. *Id.* The Court, however, after an exhaustive analysis of the cited precedents, found that none of the cited historical precedents offered by the respondents were sufficiently analogous to justify New York's regulations, which denied citizens the right to publicly carry a firearm without a showing of proper cause. *Id.* at 38-39, 70.

¶ 71 To reach this conclusion, the *Bruen* Court undertook a comprehensive analysis of the cited historical precursors in light of New York's regulatory scheme. *Id.* at 38-71. The Court did *not* expressly consider any of this widespread historical evidence to determine the constitutionality of any other, alternative firearm licensing scheme. It applied the mandatory text-and-history test *only* to determine the constitutionality of New York's requirement that citizens show a special need to obtain a license to publicly carry a firearm for self-defense.

¶ 72 To complete its analysis, the *Bruen* Court undertook a "long journey through the Anglo-American history of public carry," reaching the conclusion that the *Bruen* respondents failed to meet their burden to show that New York's proper-cause regime met constitutional muster under the second and fourteenth amendments. *Id.* at 70. The *Bruen* Court, therefore, held that "[u]nder *Heller*'s text-and-history standard, the proper-cause requirement" is unconstitutional. *Id.* at 39.

¶ 73 Approximately two years after *Bruen*, in *Rahimi*, the Court again addressed a second amendment challenge to a modern gun regulation. The Court applied the same text-and-history standard to address a defendant's challenge to a federal statute (18 U.S.C. § 922(g)(8)(C)(i) (2018)) that prohibits citizens subject to a domestic violence restraining order from possessing a firearm when they are a credible threat to the physical safety of a person. *Rahimi*, 602 U.S. at 688-90.

¶ 74 At the outset of its analysis, the *Rahimi* Court again reminded lower courts that they are directed to examine " 'constitutional text and history' " (*id.* at 691 (quoting *Bruen*, 597 U.S. at 22)) and consider our " 'historical tradition of firearm regulation' " to determine the contours of the second amendment when faced with a second amendment challenge to modern gun regulations (*id.* (quoting *Bruen*, 597 U.S. at 17)). The *Rahimi* Court explained, "if a challenged regulation fits within that tradition, it is lawful under the Second Amendment." *Id.* The court *must* determine whether the challenged regulation is consistent with the principles that underpin our regulatory traditions and determine whether the new law is relevantly similar to laws that our tradition is understood to permit. *Id.* at 692. Central to this inquiry is why and how the regulation burdens the right. *Id.*

¶ 75 After conducting the text-and-history analysis established in *Heller* and as made further explicit in *Bruen*, the *Rahimi* Court concluded that the federal statute that prohibits possession of handguns by citizens subject to domestic violence restraining orders is constitutional under the second amendment. *Id.* at 693. The Court held that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* at 702.

¶ 76 Importantly, for purposes of interpreting footnote 9 in the *Bruen* decision, the *Rahimi* Court did not short-circuit the text-and-history analysis merely because the end result of the analysis was consistent with "what common sense suggests." *Id.* at 698. Instead, the *Rahimi* Court required the government to meet its burden under the historical prong of the test. The Court analyzed the government's historical evidence, concluding that the government presented "ample" evidence that the second amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others. *Id.* at 693. Only *after* applying the text-and-history test did the Court reach the "common sense" conclusion that, if "an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698.

¶ 77 *Bruen* and *Rahimi* unequivocally illustrate how the Supreme Court's mandated text-and-history inquiry, established in *Heller*, applies when parties raise second amendment challenges to modern firearm regulations. The courts "must" conduct this analysis. *Bruen*, 597 U.S. at 17 (when the plain text of the second amendment

covers an individual's conduct, "the government *must* demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation" (emphasis added)); *Rahimi*, 602 U.S. at 692 (to conduct the appropriate analysis, "[a] court *must* ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit" (emphasis added) (quoting *Bruen*, 597 U.S. at 29)).

¶ 78      Here, contrary to what *Heller*, *Bruen*, and *Rahimi* plainly require, the majority has bypassed all textual and historical considerations in relation to Illinois's firearm regulations by suggesting that *Bruen*'s footnote 9 embodies a holding that directly contradicts what *Heller*, *Bruen*, and *Rahimi* expressly state is required. However, nowhere in *Heller*, *Bruen*, or *Rahimi* does the Court analyze any aspect of Illinois's Concealed Carry Act or any other states' "shall issue" licensing statute under the text-and-history standard, and the Court offers no express language whatsoever stating that second amendment challenges to shall-issue licensing schemes are exempt from consideration of textual and historical issues. Instead, each time the Court has addressed a second amendment challenge to a modern firearm regulation, the Court has undertaken the full textual and historical analysis. See *Bruen*, 597 U.S. at 108, 111 (Breyer, J., dissenting, joined by Sotomayor and Kagan, JJ.) (noting that in *Heller* the majority "undertook 40 pages of textual and historical analysis" and, in *Bruen*, the majority's historical analysis consisted of 30 pages of review of "numerous original sources from over 600 years of English and American history").

¶ 79      Nothing in any of the Court's discussion of the text-and-history standard in *Bruen* leads to the conclusion that a majority of the Court has, *sua sponte*, completed this required comprehensive analysis with respect to shall-issue licensing regimes, with no post-*Heller* appeal before the Court raising a challenge to those licensing regimes. To reach this conclusion, one has to surmise that, at some point after *Heller* was decided, a majority of the Court conducted a nonpublic text-and-history analysis of shall-issue licensing, relieving the government of any burden of establishing that shall-issue regulations comport with our country's historical regulation of firearms and reaching the conclusion that shall-issue regimes are supported by some unnamed historical precursors. Moreover, in order to do so, the Court would have had to seek out the relevant historical precursors

from some undefined historical record, without the government's input or arguments from any citizen challengers.

¶ 80     Absent the above described absurd speculation, the obvious conclusion is that a majority of the Court has not conducted this required text-and-history analysis. The Court has not canvassed any historical record furnished by the government to determine if requiring *any* license, even one with objective criteria, has analogues in American history, and the *Bruen* Court went to great lengths to emphasize that this was the required inquiry before a court can conclude that any firearm regulations comply with our constitution's second amendment.[7]

¶ 81     Considering context, the *Bruen* Court inserted footnote 9 into its decision after the Court elaborated on *Heller*'s text-and-history analysis and just before the Court explained that applying these principles to New York's proper-cause requirement for public carry of a firearm revealed that New York's statute was unconstitutional. *Id.* at 38-39 (majority opinion). In this context, it becomes apparent that the Court added footnote 9 for the sole purpose of emphasizing that its analysis of New York's licensing regime was not applicable to other states' shall-issue licensing regimes because New York's statute was distinguishable. See *id.* at 38 n.9. Therefore, the only conclusion that can be reached from the content and context of footnote 9 is that the text-and-history analysis of "shall issue" licensing statutes will be different than the analysis set out in *Bruen* and that *Bruen* should not be interpreted as invalidating shall-issue gun licensing regulations that were not considered in that case. Nothing more can be gleaned from footnote 9.

¶ 82     The language of the footnote itself bears this out.[8] Footnote 9 begins with a citation of Justice Hardiman's dissent in *Drake v. Filko*, 724 F.3d 426, 442 (3d Cir.

---

[7]The *Bruen* majority noted that, at the time of its decision, 25 states had eliminated firearm permit requirements altogether and have adopted "so-called '*constitutional carry*' *protections* that allow certain individuals to carry handguns in public within the State without *any* permit whatsoever." (Emphasis added and in original.) *Bruen*, 597 U.S. at 13 n.1.

[8]*Bruen*'s footnote 9 states, in full, as follows:

> "To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit].' *Drake v. Filko*, 724 F. 3d 426, 442 (CA3 2013) (Hardiman, J., dissenting). Because these licensing regimes do not require applicants to show an atypical

2012) (Hardiman, J., dissenting), where Justice Hardiman discusses the differences between may-issue licensing regimes and shall-issue licensing regimes. *Bruen*, 597 U.S. at 38 n.9. *Drake* is a pre-*Bruen* decision where the court addressed the constitutionality of the may-issue firearm licensing regulations of New Jersey. *Drake*, 724 F.3d at 428-30 (majority opinion). *Drake* did not address any shall-issue regulations, such as Illinois's. Importantly, like the majority in the present case, the *Drake* court majority declined to engage in a "full-blown historical analysis" (*id.* at 431) and arguably reached an *incorrect* conclusion concerning the requirements of the second amendment as later established in *Bruen* when the full historical analysis was conducted by the Court (see *id.* at 440 (the requirement that applicants demonstrate a " 'justifiable need' to publicly carry a handgun for self-defense" "does not burden conduct within the scope of the Second Amendment's guarantee")). Here, the majority makes the same mistake in refusing to conduct the required historical analysis. Therefore, the *Bruen* Court's citation of the dissent in *Drake* is only for purposes of distinguishing between the licensing regimes, not as a substitution for text-and-history analysis or a veiled message that the analysis is not necessary for challenges to shall-issue regulations, particularly where the majority in *Drake* declined to conduct historical analysis and reached an incorrect result.

¶ 83        Next in footnote 9, the Court cited *Heller* for the proposition that "shall-issue" licensing regimes do not require applicants to show an atypical need for armed self-defense and, therefore, do not necessarily prevent law-abiding, responsible citizens from exercising their second amendment right to public carry. *Bruen*, 597 U.S. at 38 n.9. Again, the *Bruen* majority's fleeting mention of *Heller* in this footnote is a

---

need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry. *District of Columbia v. Heller*, 554 U. S. 570, 635 (2008). Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' *Ibid*. And they likewise appear to contain only 'narrow, objective, and definite standards' guiding licensing officials, *Shuttlesworth v. Birmingham*, 394 U. S. 147, 151 (1969), rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion,' *Cantwell v. Connecticut*, 310 U. S. 296, 305 (1940)—features that typify proper-cause standards like New York's. That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Bruen*, 597 U.S. at 38 n.9.

far cry from the lengthy historical analysis set forth within the body of the decision itself and set out in *Heller*. This is particularly true where the Court's analysis in *Heller* was *not* a textual and historical analysis of a "shall-issue" public carry firearm licensing statute, and the Court expressly clarified that in neither *Bruen* nor *Heller* did it undertake an exhaustive historical analysis of the full scope of the second amendment. *Id.* at 32; *Heller*, 554 U.S. at 635 (because *Heller* was the "Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field"). Again, in this context, the *Bruen* Court's citation of *Heller* in footnote 9 cannot be considered a substitution for the text-and-history analysis as the majority concludes in the present case.

¶ 84 With respect to the remaining cases the Court cited in footnote 9, *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969), and *Cantwell v. Connecticut*, 310 U.S. 296 (1940), they do not address second amendment challenges under any standard, much less the required text-and-history standard. At most, these cases are cited in the footnote as principles that the courts may need to consider *when* faced with a second amendment challenge to shall-issue licensing schemes; they are not cited as justification for bypassing the text-and-history analysis that the Court went to great lengths to set out in detail in the body of the opinion along with repeated mandatory directives that the test must be used.

¶ 85 In concluding that footnote 9 in *Bruen* "expressly held" that Illinois's shall-issue licensing scheme complies with the second amendment, the majority gives considerable weight to Justice Kavanaugh's special concurrence joined by Chief Justice Roberts (*Bruen*, 597 U.S. at 79-81 (Kavanaugh, J., concurring, joined by Roberts, C.J.)). See *supra* ¶¶ 41-42. Undeniably, Justice Kavanaugh's concurrence contains the express statement that "shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice." *Bruen*, 597 U.S. at 80. In addition, Justice Kavanaugh and Chief Justice Roberts provided two votes that were necessary to the six-justice majority in *Bruen*. However, those two justices' votes, standing alone, do not constitute the *Bruen* majority. If the *Bruen* majority had reached the conclusion that Justice Kavanaugh explicitly stated in his concurrence, that explicit language would be included within the body of the *Bruen* majority opinion, or even in footnote 9, but it is not. Accordingly, it cannot be said

that the *Bruen* majority reached this additional, unstated conclusion. See *Maryland v. Wilson*, 519 U.S. 408, 412-13 (1997) (concurrence is not binding precedent).

¶ 86    Furthermore, Justice Alito stated in his concurrence that *Bruen* "decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun." *Bruen*, 597 U.S. at 72 (Alito, J., concurring). Justice Alito's clarification is equally true concerning the scope of the second amendment as it relates to any aspect of Illinois's licensing scheme that was, likewise, *not* before the Court in *Bruen*. See *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023) (noting that nothing in *Bruen* allows the court to sidestep the text-and-history analysis and emphasizing that the courts "must undertake the text-and-history inquiry the Court so plainly announced and expounded upon at great length").

¶ 87    Accordingly, I agree with defendant that the appellate court below erred in disregarding the textual and historical analysis. Because the appellate court did not properly conduct this analysis, I believe this court should vacate the appellate court's decision and remand this case to the appellate court with directions that it consider defendant's second amendment challenge by applying the textual and historical analysis mandated by our Supreme Court in *Heller*, *Bruen*, and *Rahimi* for analyzing second amendment challenges to modern firearms regulations. For these reasons, I respectfully dissent.

¶ 88    JUSTICE O'BRIEN took no part in the consideration or decision of this case.