2025 IL App (1st) 242152-U

SECOND DIVISION
December 23, 2025

No. 1-24-2152

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 22 CR 11810 |
| | ) | |
| BENNIE BRYANT, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

**ORDER**

¶ 1    ***Held***:  We affirm defendant's conviction over his contentions that the State failed to prove that he actually possessed a firearm, and that the FOID Card Act is unconstitutional.

¶ 2    A jury found Bennie Bryant guilty of (1) possessing a firearm without a Firearm Owners Identification Card (FOID Card) (430 ILCS 65/2(a)(1) (West 2022)), and (2) aggravated unlawful use of a weapon (AUUW) (725 ILCS 5/24-1.6(a) (West 2022)). The circuit court sentenced him

to 30 months' imprisonment on the first count only. On appeal, Bryant argues that the State failed to prove beyond a reasonable doubt that he possessed a firearm. He also argues that the FOID Card Act is unconstitutional under the second amendment to the United States Constitution. U.S. Const., amend. II. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On July 21, 2022, Chicago police pulled Bryant over because of his vehicle's heavily tinted license plate. During the traffic stop, Bryant suddenly shifted into drive and fled the scene. Police pursued him briefly, but they were unable to locate him. They recovered a firearm and a magazine nearby. They later obtained an arrest warrant, arrested Bryant, and the State charged him with a FOID Card Act violation and a violation of the AUUW statute. See 430 ILCS 65/2(a)(1) (West 2022); 725 ILCS 5/24-1.6(a) (West 2022).

¶ 5     In a separate 2019 case, Bryant committed an offense that resulted in two class four felony charges that the State brought on April 5, 2019. Those two charges were (1) knowing possession of a fictitious license and (2) unlawful possession of a credit or debit device. At that time, Bryant did not have any felony convictions, and he was able to plead those two felony charges down to one class A misdemeanor (theft under $500). He received conditional discharge. The 2019 case is relevant because of Bryant's argument related to FOID Card Act constitutionality.

¶ 6     On May 13, 2024, Bryant moved to dismiss the charges in this case, bringing the same arguments he raises in this appeal. In that motion, he admitted receiving notice of his FOID card revocation "on or about" April 4, 2019. The Illinois State Police actually revoked Bryant's FOID card on February 19, 2019, which Bryant did not and does not dispute. The court denied the motion to dismiss, and the case proceeded to a jury trial.

¶ 7                                    A. The Jury Trial

¶ 8     The State called four Chicago police officers: Eddie Ishoo, Mike Kruzel, Jorge Calderon, and Michael Yelton. All four officers were on the scene during at least a portion of the traffic stop and the subsequent pursuit that led to the discovery of a firearm and a magazine. The State also called Thomas Hagen, a civilian who was in the area of the pursuit and testified that he heard a scraping sound and then observed a gun on the street near the sidewalk he was standing on. Finally, the State called John Strode, who worked for the Illinois State Police (ISP) Firearm Service Bureau. Strode testified that the ISP had revoked Bryant's FOID card more than three years before this incident. The circuit court admitted into evidence three officers' body camera videos depicting the traffic stop, subsequent pursuit, and firearm recovery; the videos did not contain audio recordings. The State rested its case.

¶ 9     The defense moved the court for a directed verdict, arguing that nobody observed Bryant discard a gun from his vehicle. The court denied the motion. The defense presented its case in chief and called only one witness – Bennie Bryant III – Bryant's father. Bryant III testified as to where Bryant resided at the time the ISP revoked his FOID card. We recount the relevant portions of the trial testimony below.

¶ 10                                1. Officer Eddie Ishoo

¶ 11     Chicago police Officer Eddie Ishoo testified that at approximately 9:45 p.m. on July 21, 2022, he and his partner Chicago police officer Mike Kruzel were in uniform and driving westbound on Hubbard Street in a marked police car when they saw Bryant driving southbound on Dearborn Street in a white Ford Taurus with a license plate obstructed by tinting. The officers stopped Bryant's vehicle in a driveway adjacent to the House of Blues. Upon approaching Bryant's car, they noticed heavily tinted windows. Ishoo walked over to the driver's side of Bryant's car, while Kruzel went to the passenger's side. When Bryant rolled down the driver's side window,

Ishoo shined his flashlight into the vehicle; he could not see any firearms. Bryant was the car's sole occupant. Ishoo requested Bryant's driver's license and proof of insurance. Bryant handed Ishoo his license. Ishoo walked back to his squad car to run Bryant's name. Assisting officers, including Sergeant Rivers, as well as Officers Michael Yelton and Jorge Calderon, arrived at the scene.[1]

¶ 12    After running Bryant's name, Ishoo walked back to Bryant's car to return his driver's license, briefly placing it on the Taurus's trunk. At that moment, Bryant's "vehicle took off" "[w]estbound from the driveway, northbound on Dearborn." Ishoo and Kruzel began pursuing Bryant's Taurus, but lost sight of it.

¶ 13    Ishoo testified that a civilian named Thomas Hagen flagged down his partners, and Ishoo saw them and stopped the car. Ishoo observed a firearm on the ground next to a parked vehicle "approximately two city streets" from where they initially stopped Bryant. The police did not apprehend Bryant that night. However, they later obtained an arrest warrant and arrested him.

¶ 14                                    2. Officer Mike Kruzel

¶ 15    Officer Kruzel testified consistently with Ishoo. Kruzel added that while he was at the passenger's side of Bryant's car, Bryant kept lowering and raising the vehicle's windows. Kruzel stated that assisting officers arrived at the scene, including Rivers, who opened Bryant's door during the time Ishoo walked back to his squad car to run Bryant's name. As soon as Rivers opened the driver's side door of Bryant's car, Bryant "stepped on the gas and went straight at a high rate of speed."

¶ 16    Kruzel and Ishoo pursued Bryant's car but could not locate it. They stopped at the intersection of Dearborn Street and Hubbard Street, where a "bike taxy, a cabbie" flagged them

---

[1]Rivers did not testify at trial, and no first name for this individual appears in the record.

down. Pursuant to that individual's information, Kruzel "walked over to Dearborn and Kinzie and located a magazine loaded with 9-millimeter ammo." According to Kruzel, this was approximately one block from where he exited the squad car. At Dearborn and Kenzie, the magazine "was right on the corner of the sidewalk." He picked up the magazine wearing gloves. Kruzel determined that the magazine had live ammunition in it. The location of the magazine was within his and Ishoo's path of travel after they began pursuing Bryant when he fled from the traffic stop.

¶ 17                                3. Officer Jorge Calderon

¶ 18     Officer Calderon testified that he was assigned to a patrol unit with his partner Officer Michael Yelton on the night of the traffic stop. The officers were in a marked police car wearing police uniforms. They arrived at the traffic stop where Ishoo and Kruzel had stopped Bryant's Taurus. He observed only one occupant, Bryant, in the driver's seat. Calderon approached Bryant's vehicle on the passenger's side, and Bryant briefly rolled down his windows. With the windows rolled up, visibility inside the car was "minimal." Calderon instructed Bryant several times to roll the windows down, but he kept rolling them back up.

¶ 19     Rivers arrived on the scene and ordered Bryant to exit the vehicle. "At that point, he refused orders, put the car in drive and fled from the scene." Bryant fled westbound and quickly turned right on Dearborn, headed northbound. Calderon and Yelton entered their squad car and began pursuing Bryant until they were flagged down by pedestrians, including Hagen. After speaking with the pedestrians, Calderon observed a firearm "[o]n the street next to the curb." He then picked up the 9-millimeter firearm, which did not have a magazine inserted in it. Kruzel then handed him a "magazine with ammunition in it." Calderon later gave Yelton the firearm to inventory.

¶ 20                                4. Officer Michael Yelton

¶ 21   Officer Yelton testified that he and his partner, Officer Calderon, pursued Bryant after he sped away from the traffic stop. The officers stopped at the intersection of Dearborn and Hubbard. Yelton observed a gun lying on the street between a parked "Prius Toyota, like a taxi cab" and the sidewalk curb. Yelton stated that Calderon recovered a 9-millimeter firearm. Later that evening, Yelton took custody of the gun. Yelton stated that Kruzel recovered a firearm magazine and gave it to Calderon. Yelton inventoried both the firearm and the magazine.

¶ 22                                5. Thomas Hagen

¶ 23   Thomas Hagen testified that, shortly before 10 p.m. on July 21, 2022, he was standing at the intersection of Dearborn and Hubbard. Specifically, he "was standing near the curb of – near the street on the sidewalk." He had consumed "several" alcoholic drinks at dinner with friends that evening but did not recall the exact number. Hagen observed what looked like a police car, "like a white Ford Taurus unmarked police car" "traveling at a high rate of speed." He noticed a "tremendous amount" of police presence in the area. Hagen "heard something scraping across the street and then landing and making like a thud noise [] against the curb." The "something" landed "[a]lmost at [his] feet." He noted there was a white taxicab parked curbside as well. Hagen "looked down right beside [his] foot and [he] saw what appeared to be a handgun behind [] the back wheel of the taxi cab." Hagen alerted a police officer nearby "almost instantaneous[ly]." He testified that he did not actually witness a firearm being thrown. Also, Hagen did not see where the scraping sound came from.

¶ 24                        6. Body-Worn Camera Footage

¶ 25   The State produced video-only body-worn camera (BWC) footage from Ishoo, Kruzel, and Calderon.

¶ 26                            a. Ishoo's BWC Footage

¶ 27    The BWC footage opens with Ishoo driving his squad car at approximately 9:45 p.m. on July 21, 2022. At 9:47 p.m., he exits his vehicle and begins approaching an unmarked white Ford Taurus on foot with his flashlight in hand. The Taurus's license plate is tinted. He approaches the Taurus's driver's side. Both driver's side windows are initially rolled all the way down. Ishoo appears to request something from the driver (Bryant), and he appears to comply, handing Ishoo a driver's license. At 9:48 p.m., Kruzel stands at the passenger's side window, while Ishoo and Bryant are still speaking to each other. Ishoo then walks back to his squad car with Bryant's driver's license in hand.

¶ 28    Ishoo sits down in the driver's seat of the squad car, holds the license, and runs the name on his laptop. At 9:57 p.m., Ishoo exits the squad car and begins walking toward the Taurus. At least four officers are gathered around the Taurus. Within a few seconds, Ishoo places the driver's license on the Taurus's trunk, and the Taurus immediately speeds away. The license falls off, Ishoo picks it up, walks back to his squad car where Kruzel is already seated in the passenger's front seat, enters the vehicle, and the pursuit begins at 9:58 p.m.

¶ 29    Ishoo drives forward, makes a right turn, drives forward for about 20 seconds, makes a left turn, and stops; the entire pursuit lasts approximately 40 seconds. A lit "Hub 51" logo can be seen protruding from the side of a building to the left. At approximately 9:59 p.m., Ishoo exits the squad car and walks toward a white Toyota Prius that appears to be parked about a foot from the sidewalk curb. A black gun lies on the concrete between the Prius's front left wheel and the sidewalk curb. Several officers and civilians are looking at the gun. Within a few seconds, the Prius backs up, and the gun is in plain view. There are at least four marked police vehicles visible.

¶ 30                              b. Kruzel's BWC Footage

¶ 31    At approximately 9:46 p.m., Kruzel is in the passenger's seat. At 9:47 p.m., he exits the squad car and begins walking toward the right side of the white Ford Taurus. Ishoo can already be seen standing next to the driver's side of the Taurus as Kruzel approaches it. As soon as Kruzel arrives at the vehicle, Bryant rolls up the rear right window and immediately rolls it down again. He then rolls down the front passenger's side window. Kruzel stands near the passenger's side front window and shines his flashlight inside. At approximately 9:48 p.m., a second officer stands next to the rear right window, which Bryant again rolls up. About 20 seconds later, Bryant rolls that window down again. At approximately 9:49 p.m., Bryant shows Ishoo something on his phone. By 9:50 p.m., three officers, including Ishoo and Kruzel, are shining their flashlights into Bryant's vehicle through three windows (all but the rear left window). At around the same time, Bryant places his phone to his right ear. Kruzel walks back to the passenger's side of his squad car. Ishoo can be seen in the driver's seat operating the laptop.

¶ 32    The video then skips ahead to 9:55 p.m. Kruzel is speaking with Rivers near Kruzel's squad car. Rivers speaks briefly with Ishoo, and then Rivers and Kruzel walk forward to the Taurus, which is surrounded by three police officers. At 9:57 p.m., Bryant again holds a phone to his right ear. At 9:57:33 p.m., sergeant Rivers reaches inside the vehicle through the driver's door and opens it for a moment before Bryant quickly puts his vehicle in drive and speeds away. Just before 9:58 p.m., Kruzel is back inside the passenger's seat of his squad car. A few seconds after 9:58 p.m., Ishoo also gets in, puts the car in drive, and the pursuit begins.

¶ 33    Kruzel and Ishoo arrive on scene in their squad car seconds before 9:59 p.m., and at exactly 9:59 p.m., Kruzel arrives at the white Prius (located adjacent to the firearm by the sidewalk curb). After about 15 seconds, Kruzel speaks with a rickshaw driver at the scene. The rickshaw driver points straight ahead, and Kruzel jogs down the street following him (while he is still driving his

rickshaw) for about a block. At precisely 10:00:11 p.m., Kruzel picks up a firearm magazine from the side walk. He begins walking back to the location where Ishoo recovered the gun. He jogs again, arriving at the gun's location at approximately 10:00:40 p.m. That is, approximately 30 seconds pass between the time he picks up the magazine and the time he is back at the location where the firearm was discovered. He hands Calderon the magazine.

¶ 34                                c. Calderon's BWC Footage

¶ 35     Yelton (driver) and Calderon (passenger) arrive on scene at approximately 9:48 p.m. At that time, Ishoo's squad car can be seen in front of Calderon's, and the white Ford Taurus can be seen in front of Ishoo's vehicle. Yelton and Calderon walk forward, approaching the Taurus at approximately 9:49 p.m. Ishoo and Kruzel are already there. A couple seconds after 9:49 p.m., Bryant rolls the rear right window up, and then back down. Calderon stands adjacent to the Taurus for a couple minutes with his flashlight in hand. Shortly after 9:50 p.m., Bryant places his phone to his ear. Nothing remarkable happens until 9:57:33 p.m., when sergeant Rivers reaches inside the vehicle through the rolled-down driver's side window. Bryant speeds away immediately. A few seconds before 9:58 p.m., Calderon and Yelton enter their squad car and begin the pursuit.

¶ 36     Yelton drives forward and makes a right, but the Taurus cannot be seen on Calderon's BWC footage. Yelton drives through a red light and makes a left, stopping just before a "Hub 51" logo attached to the side of a building. The officers exit their vehicle at 9:58:33. Calderon walks a few steps toward a white Toyota Prius parked next to the sidewalk curb. There is a black firearm a few inches behind the front driver's side tire of the Prius. The Prius is occupied by at least two individuals, including the driver, who backs the Prius up so that the gun is completely unobstructed. Wearing a glove on his right hand, Calderon picks up the gun at 9:59:38 p.m. At

approximately 10:00:40 p.m., Kruzel jogs toward Calderon, magazine in hand, and gives the magazine to him.

¶ 37                                7. John Strode

¶ 38    John Strode, an employee of the ISP's Firearm Service Bureau, testified that he received the State's request to review Bryant's FOID card record on October 26, 2022. On May 23, 2024, he reviewed Bryant's record and discovered that his FOID card had been revoked on February 19, 2019. At the time of the traffic stop at issue, Bryant's FOID card had been revoked for approximately three and a half years. Strode explained that when a FOID card holder's card is revoked, the ISP sends a letter to that person.

¶ 39                        B. The Jury's Verdict and Post-Trial Motion

¶ 40    The jury found Bryant guilty on both counts. On July 22, 2024, Bryant filed a post-trial motion requesting a new trial arguing that the State failed to prove beyond a reasonable doubt that he possessed a firearm and a magazine. The circuit court denied the motion and sentenced Bryant to two and a half years in prison. Bryant appeals.

¶ 41                                II. ANALYSIS

¶ 42    On appeal, Bryant argues that (1) the State failed to meet its burden in proving that he possessed a firearm, and (2) the FOID Card Act is unconstitutional, both facially and as applied to him.

¶ 43                        A. Sufficiency of the Evidence

¶ 44    Bryant argues that the State did not prove he had actual possession of the recovered firearm because no one ever observed Bryant with it. A section 2(a)(1) violation of the FOID Card Act requires proof of the defendant knowingly possessing a firearm and knowing he did not have a valid FOID card. See *People v. Garcia*, 2025 IL App (2d) 240449, ¶ 43. A section 24–1.6(a)(1),

(a)(3)(C) violation of the AUUW statute occurs "by knowingly carrying on his person or in any vehicle, outside the home, a firearm without having been issued a valid FOID Card." *People v. Williams*, 2015 IL 117470, ¶ 14. As possession of a weapon is an element of both the AUUW offense and the FOID card offense, Bryant is really challenging the sufficiency of the evidence for both convictions as to that element.

¶ 45    In reviewing a challenge to the sufficiency of the evidence, we determine whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Pizarro*, 2020 IL App (1st) 170651, ¶ 29. " 'All reasonable inferences are drawn in favor of a finding of guilt.' " *People v. Bush*, 2023 IL 128747, ¶ 33 (quoting *People v. Swenson*, 2020 IL 124688, ¶ 35).

¶ 46    We do not retry the defendant; rather, we defer to the jury's evaluation of the witnesses' credibility, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence. *Id.* The circuit court, and in this case, the jury, is in the best position to judge witnesses' credibility because it personally observes their testimony and demeanor. *Id.* The testimony of a single witness is sufficient to support a conviction if the witness's testimony is credible (*People v. Gray*, 2017 IL 120958, ¶ 36), and the State may prove its case by circumstantial evidence alone (*People v. Brown*, 2013 IL 114196, ¶ 49). We will not reverse a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Hines*, 2021 IL App (1st) 191378, ¶ 31.

¶ 47    The State can prove actual possession through "testimony that shows that the defendant exercised some form of dominion over the weapon, such as trying to conceal it or throwing it away." *People v. Balark*,  2019 IL App (1st) 171626, ¶ 94. " '[W]here possession has been shown,

an inference of culpable knowledge can be drawn from the surrounding facts and circumstances.'" *Id.* (quoting *People v. Givens*, 237 Ill. 2d 311, 335 (2010)).

¶ 48 Here, the State presented extensive circumstantial evidence that Bryant actually possessed a gun by eliciting Hagen's testimony that showed Bryant discarded the recovered firearm from his vehicle as he fled. The State adduced evidence from Hagen, a civilian bystander, who was standing at the location the gun was recovered and observed "a white Ford Taurus unmarked police car *** traveling at a high rate of speed," heard a scraping sound and then a "thud" against the curb, and then saw "right beside his foot what appeared to be handgun."

¶ 49 The State called four officers to testify, all of whom were present for most, if not all, of the traffic stop, subsequent short pursuit, and firearm and magazine recovery. The State also produced BWC footage from three of the four officers who testified, corroborating their accounts of the evening's events, as well showing where Hagen and other pedestrians stood moments after the gun was discarded.

¶ 50 Further, the amount of time that elapsed between when Bryant sped away from the traffic stop (9:57:33 p.m.) and the time Calderon picked up the gun on the sidewalk (9:59:38 p.m.) is only approximately two minutes. Then, following a short 30-second jog a block away from the gun's location, Kruzel picked up a magazine at 10:00:11 p.m. Between the time Bryant absconded from the traffic stop and the time Kruzel picked up the magazine, less than three minutes had elapsed.

¶ 51 Kruzel testified that he recovered the magazine on his and Ishoo's path of travel, and that it was loaded with live 9-millimeter ammunition. Calderon testified that the firearm he recovered was a 9-millimeter handgun. Nine-millimeter guns and compatible magazines do not ordinarily appear on city streets in close temporal (30-second jog) and spatial (about a block) proximity. It is reasonable to believe that, absent human control, such as discarding the gun, it would not have

been there. Human control through Bryant is even more likely with corroborating testimony from an individual who observed the speeding vehicle, heard a scraping noise, and observed the subject firearm near his feet. There is no reasonable doubt that the same person, Bryant, possessed both the firearm and the magazine just moments before Calderon and Kruzel, respectively, recovered them.

¶ 52     Finally, to the extent that Bryant argues the State did not prove he "knowingly" possessed the recovered firearm, we note that where possession has been shown, we can infer the defendant's culpability through surrounding facts and circumstances. See *Balark*, 2019 IL App (1st) 171626, ¶ 94. As testimony and BWC footage shows, Bryant suddenly fled the traffic stop at a high rate of speed. Any rational juror could have found Bryant's flight to be an indicator of defendant's culpability. See *People v. Lewis*, 165 Ill. 2d 305, 349 (1995) ("The fact of flight, when considered in connection with all other evidence in a case, is a circumstance which may be considered by the jury as tending to prove guilt.") Moreover, a rational jury could have considered Bryant's knowledge of his revoked FOID card as an additional indicator. Any rational juror could have found the State satisfied its burden of proving "knowing" possession.

¶ 53     Accordingly, we find that any rational trier of fact could have found, beyond a reasonable doubt, that Bryant unlawfully possessed a firearm and violated both the FOID Card Act and the AUUW statute. Bryant's challenge to the sufficiency of the evidence fails.

¶ 54                              B. Constitutionality of the FOID Card Act

¶ 55     Bryant argues that the FOID Card Act (430 ILCS 65/1 *et seq.* (West 2024)) is unconstitutional because it violates the second amendment to the United States Constitution (U.S. Const., amend. II), both on its face and as applied to him. We review challenges to the constitutionality of a statute *de novo*. *People v. Madrigal*, 241 Ill. 2d 463, 466 (2011).

¶ 56    The FOID Card Act requires individuals to obtain a FOID card prior to possessing firearms or ammunition in Illinois. 430 ILCS 65/2(a). The second amendment to the United States Constitution reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. In turn, federal law provides that it is unlawful for any person who is "under indictment for a crime punishable by imprisonment for a term exceeding one year" to possess a firearm. 18 U.S.C. § 922(n) (2018).

¶ 57                                           1. Facial Challenge

¶ 58    As to his facial challenge, Bryant contends that we should reverse his conviction because "the requirement that he be issued a FOID card is not consistent with this nation's historical tradition of firearm regulation and therefore violates the right to bears arms under the Second and Fourteenth Amendments." We disagree.

¶ 59    In his reply brief, Bryant "urges [us] to consider [] *Bruen*'s historical precedent requirement," but what he fails to recognize is that the United States "Supreme Court has already done so and explicitly sanctioned the use of background checks." *People v. Gunn*, 2023 IL App (1st) 221032, ¶ 20 (citing *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022)). Illinois appellate courts statewide have overwhelmingly held that the FOID Card Act comports with the second amendment. See, *e.g.*, *Guns Save Life, Inc. v. Kelly*, 2025 IL App (4th) 230662, ¶ 41 (holding defendant's "facial constitutional challenge" to the FOID Act meritless); *People v. Paramo*, 2024 IL App (1st) 230952-U, ¶ 39 (rejecting defendant's facial challenge to the constitutionality of the FOID Act); *People v. Hatcher*, 2024 IL App (1st) 220455, ¶ 61 ("under *Bruen*, Illinois's FOID Card Act and Firearm Concealed Carry Act are not facially

unconstitutional."); *Gunn*, 2023 IL App (1st) 221032, ¶ 19 (holding that "the FOID Card Act complies with federal law.") We see no reason to depart from these well-reasoned decisions.

¶ 60 Moreover, and conclusively, the Illinois Supreme Court recently held the FOID Card Act to be facially constitutional in its opinion in *People v. Thompson*, 2025 IL 129965, ¶ 53. The majority wrote:

> "Ordinarily, the government then would need to affirmatively prove that its modern firearms regulations are part of the historical tradition that delimits the outer bounds of the right to keep and bear arms. However, *Bruen*'s express endorsement of shall-issue licensure obviates the need for this court to apply the historical-tradition component of the *Bruen* analysis to defendant's facial challenge to the enforcement of CCL and FOID card licensure through section 24-1.6(a)(1), (a)(3)(A-5). For the reasons expressed in *Bruen* itself, Illinois's shall-issue regime is not facially unconstitutional under the second amendment." *Id.*

Bryant urges us to ignore *Thompson* and consider historical precedent anyway, but we will not, and cannot, do so. See *People v. Artis*, 232 Ill. 2d 156, 164 (2009) ("The appellate court lacks authority to overrule decisions of [the Illinois Supreme Court], which are binding on all lower courts.") Thus, Bryant's challenge to the facial constitutionality of the FOID Card Act is meritless.

¶ 61                                    2. As-Applied Challenge

¶ 62 Bryant argues that the FOID Card Act is unconstitutional as applied to individuals like him, whose FOID card was revoked because they were indicted for a felony but not convicted of one. Bryant contends that his FOID card revocation was premised on him having been indicted for two class four felonies (knowing possession of a fictitious license and unlawful possession of a credit or debit device), which he pleaded down to a misdemeanor theft. And, Bryant argues, the FOID

Card Act should not trigger card revocation for people convicted of nonviolent misdemeanors, such as his theft misdemeanor.

¶ 63    Section 8 of the FOID Card Act provides, "The Department of State Police has authority to deny an application for or to revoke and seize a [FOID card] previously issued" if one of several objective factors, such as age or criminal history, disqualifies the person for FOID licensure. *People v. Thompson*, 2025 IL 129965, ¶ 18; 430 ILCS 65/8 (West 2024). Section 8 enumerates various conditions that the ISP may rely on to revoke an individual's FOID card or deny an application for a FOID card. 430 ILCS 65/8(a)-(u) (West 2024). Bryant asserts that his revocation was premised on section 8(n), which allows the ISP to revoke a FOID card from any "person who is prohibited from acquiring or possessing firearms or firearm ammunition by any Illinois State statute or by federal law." *Id.* § 8(n).

¶ 64    Problematically, Bryant *assumes* that his FOID card revocation was premised on his two felony indictments (which later culminated in a single misdemeanor of theft). However, there is no indication in the record that suggests the ISP revoked his FOID card because of this offense. In fact, we do not know why the ISP revoked his FOID card. Bryant himself admits he does not know why in his motion to dismiss, which reads, in relevant part: "[i]t is therefore entirely unclear from Counsel's reading exactly what statutory grounds ISP and Cook County Sheriff's Police Department relied upon in revoking Mr. Bryant's FOID card." We *do* know, however, that it *was* revoked on February 19, 2019, as indicated in ISP's records.[2] *Why* it was revoked appears to be unknown, and we will not simply assume, based on Bryant's bare allegation, that ISP's revocation of his FOID card was based on section 8(n). See *People v. Brown*, 2020 IL 124100, ¶ 34 ("A court

---

[2]Moreover, in his motion to dismiss, Bryant also stated that he received notice of the revocation on or about April 4, 2019.

may not simply assume that alleged factual matters are true when considering an as-applied constitutional challenge. We reiterate that when a court holds a statute unconstitutional as applied, that holding must be based on an established factual record."). Additionally, we, as a reviewing court, are not arbiters of fact, so we will not consider whether the ISP relied on section 8(n). See *People v.* Mosley, 2015 IL 115872, ¶ 47.

¶ 65    In short, the constitutionality of section 8(n) was not an issue at Bryant's trial, nor did the circuit court did make any findings regarding its constitutionality. Bryant's failure to cite any evidence in support of this claim is fatal. See also *People v. Kelly*, 2018 IL App (1st) 162334, ¶¶ 24-25. Based on the foregoing, we hold that the FOID Card Act is constitutional both on its face and as applied to Bryant.

¶ 66                                III. CONCLUSION

¶ 67    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 68    Affirmed.