**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 240556-U

Order filed January 28, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-24-0556 Circuit No. 22-CF-171 |
| | ) | |
| BRANDON M. MORROW, | ) ) | Honorable Chrystel L. Gavlin, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Justices Holdridge and Anderson concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  (1) The circuit court did not err in denying defendant's motion to suppress evidence. (2) The unlawful use of a weapon statute is facially constitutional. (3) Defendant's jury waiver was made knowingly and voluntarily. Affirmed.

¶ 2    Defendant, Brandon M. Morrow, appeals following his conviction for unlawful use of a weapon (UUW). He contends the court erred in denying his motion to suppress evidence where the weapon he was charged with possessing was discovered as the result of a seizure without reasonable articulable suspicion. Further, defendant argues the UUW statute under which he was

convicted is facially unconstitutional. Finally, defendant argues his jury waiver was not validly made where no discussion of the jury waiver occurred on the record. We affirm.

¶ 3                                                    I. BACKGROUND

¶ 4        Defendant was charged, *inter alia*, with UUW (720 ILCS 5/24-1(a)(4) (West 2022)) alleging that on February 1, 2022, defendant knowingly possessed a 9-millimeter firearm in a vehicle while not in a statutorily allowed location. In December 2022, defendant filed a motion to suppress evidence arguing he had been subjected to a traffic stop without reasonable suspicion. The motion proceeded to a hearing in February 2023.

¶ 5        At the hearing, Officer Nicholas Christopher of the Bolingbrook Police Department testified that on the evening of February 1, 2022, while on patrol, he observed a maroon truck driving on the roadway. He recognized the truck from officer safety e-mails he had received in December 2021, and January 2022. The e-mails detailed an altercation at a business with an individual named Terrell Fanniel, who pointed a firearm at patrons, and connected him to the maroon truck. Christopher knew Fanniel from prior contact as well as the e-mails.

¶ 6        Christopher testified when he first saw the truck, he did not observe any traffic violations. The truck was a rental, he did not know who had rented it, and he could not recall if he attempted to check the truck's registration. When he recognized the truck, he turned around and began to follow it, but he did not initially believe he had a reason to stop the truck. Eventually, Christopher observed the truck turn without giving a continuous signal for 100 feet prior to turning. He did not measure the distance, but estimated the length based on his department's shooting range, which was 100 feet. Christopher stopped the truck and observed two individuals inside. He identified defendant as the driver and Fanniel as the passenger. Upon approach, Christopher smelled the odor

2

of burnt cannabis. Defendant acknowledged the odor but denied smoking cannabis. Christopher ordered defendant to turn off the truck for safety reasons, and he called for backup.

¶ 7     When defendant was retrieving his identification, Christopher noticed a firearm owner's identification (FOID) card in defendant's wallet. Christopher asked defendant whether he had any firearms in the truck, and defendant told him there was an unloaded firearm in the glove compartment. Christopher determined that defendant possessed a valid FOID card but not a concealed carry license (CCL). Defendant and Fanniel exited the truck, and Christopher searched it based on the odor of burnt cannabis. He found a loaded firearm in the center console, immediately accessible to the driver. Additionally, Christopher found an open bottle of tequila and baggies of cannabis. Defendant was placed under arrest.

¶ 8     A video recording of the incident was admitted and published. The video showed defendant turned on his right turn signal and began to brake almost simultaneously as he approached an intersection. Seconds later, before defendant turned, Christopher activated his emergency lights. Defendant then turned right and pulled the truck over to the side of the road. Christopher called for backup and approached the truck. He explained to defendant why he stopped him and asked when he last smoked cannabis, mentioning the odor of burnt cannabis. Defendant denied smoking recently or inside the truck. As defendant retrieved his license, Christopher asked him about his FOID card. Defendant stated he had a FOID card but not a CCL. When asked about firearms in the truck, defendant told Christopher there was an unloaded firearm in the glove compartment. Other officers arrived at the scene. Defendant and Fanniel exited the truck and were patted down. The truck was searched, and Christopher located a firearm in the center console. Defendant acknowledged the firearm belonged to him. Defendant was placed under arrest for UUW.

¶ 9          Christopher agreed he activated his emergency lights before defendant began to turn. Christopher stated he could not know for certain whether defendant would turn at that intersection when he initiated the stop, but explained he knew Fanniel lived on that street. Christopher admitted that, at that point, he did not know whether Fanniel was in the truck.

¶ 10         The court denied the motion to suppress, finding that, given the testimony and video evidence, Christopher had a reasonable articulable suspicion for an improper turn signal violation. Further, the court found that Christopher, having seen defendant's FOID card and learning of the existence of a firearm in the truck, had a legal right to investigate whether the firearm was being transported in a legal manner. Defendant filed a motion to reconsider which was subsequently heard and denied.

¶ 11         In December 2023, the case proceeded to a bench trial. Prior to the start of trial, the parties stated their appearances and the court said, "The waiver of trial by jury has been accepted," listed the charges against defendant, and asked if "[e]veryone [was] on the same page with that?" The State agreed. Defense counsel and defendant remained silent. Defense counsel indicated they had no pretrial motions. The court then stated, "Okay. All right. Let's have him fill out the waiver of trial by jury. I will go over that with him." At this point, an unidentified party asked to approach the bench and defendant's case was passed momentarily. When the case was recalled, the court stated, "All right. Let's go ahead and proceed then with [defendant]. The State has a brief opening on [defendant's] case." No further discussion of defendant's jury waiver occurred and the trial began.

¶ 12         At trial, Christopher's testimony was largely consistent with his testimony at the suppression hearing. Evidence, including testimony and certified abstracts from the Illinois State Police Firearms Services Bureau were admitted showing that defendant possessed a valid FOID

4

card on the date of the offense, but not a CCL. Defendant was found guilty of UUW. At the sentencing hearing, the State indicated defendant had a prior conviction for domestic battery and a prior court supervision for battery in a juvenile case. Defense counsel indicated defendant attended school and was active in his church and the community. Defendant was sentenced to a 12-month term of conditional discharge. Defendant's motion to reconsider argued the court erred in denying his motion to suppress, and the UUW statute under which defendant was convicted was unconstitutional both facially and as applied to defendant. The motion to reconsider was denied. This appeal followed.

¶ 13                                II. ANALYSIS

¶ 14        On appeal, defendant argues his conviction for UUW should be reversed outright where the weapon was discovered while he was illegally seized. Defendant contends that Christopher stopped his truck for an improper turn signal violation prior to knowing whether defendant would turn or proceed straight, depriving Christopher of the reasonable articulable suspicion necessary to effectuate the traffic stop. Additionally, defendant argues the UUW statute under which he was convicted was facially unconstitutional, under the test set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). Finally, defendant argues that he did not validly waive his right to a jury trial where the record contains no affirmative statement by himself or his attorney in his presence that he wished to waive his right to a trial by jury and proceed to a bench trial. We consider each argument in turn.

¶ 15                        A. Motion to Suppress Evidence

¶ 16        When reviewing a court's ruling on a motion to suppress evidence, we apply a two-prong standard of review. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). The court's findings of fact are afforded great deference, and we will reverse only where those findings are contrary to the

manifest weight of the evidence. *Id.* However, as the decision of whether suppression is warranted constitutes a question of law, we review the court's ultimate ruling *de novo*. *People v. Lee*, 2018 IL App (3d) 170209, ¶ 20.

¶ 17     Both the United States and Illinois Constitutions protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Here, defendant was detained while driving a vehicle. "A vehicle stop constitutes a seizure of persons within the meaning of the fourth amendment." (Internal quotation marks omitted.) *People v. Haywood*, 407 Ill. App. 3d 540, 543 (2011). A police officer may conduct a brief, investigatory stop of a person where the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, amount to the reasonable belief a crime has been or is about to be committed. *People v. Timmsen*, 2016 IL 118181, ¶ 9. The officer's level of suspicion need not rise to the level of probable cause. *People v. Hackett*, 2012 IL 111781, ¶ 20. An investigatory stop must be justified at its inception and cannot be based on an inarticulable hunch. *Haywood*, 407 Ill. App. 3d at 543. In reviewing the officer's conduct, we consider the totality of the circumstances and consider whether the facts available at the time of the seizure would lead a person of reasonable caution to believe that the actions were appropriate. *Timmsen*, 2016 IL 118181, ¶ 9.

¶ 18     Here, Christopher effectuated a traffic stop because defendant did not use his turn signal continuously for 100 feet before he turned. Defendant does not challenge the distance of 100 feet. Instead, he argues Christopher did not know whether defendant would turn at that intersection, and if he had not turned, no violation would have occurred. In support of this, defendant highlights the video evidence and testimony which established Christopher activated his emergency lights prior to the turn being made. However, the video clearly demonstrated that seconds before the traffic stop, defendant activated his right turn signal and employed his brakes as he approached the

6

intersection. The fact that defendant was slowing down as he approached the intersection implies he intended to turn at that intersection. While it is legal to activate your turn signal without turning (see *Haywood*, 407 Ill. App. 3d at 544), in this instance, where defendant indicated he was going to turn and immediately began slowing to do so, it was reasonable for Christopher to believe defendant was going to commit the improper turn signal violation. Accordingly, the court did not err in denying defendant's motion to suppress evidence.

¶ 19                                    B. Constitutionality of the UUW Statute

¶ 20        Defendant asserts the dual licensing requirements of the FOID card and CCL of the UUW statute are facially unconstitutional under the test set forth in *Bruen*, where the State cannot demonstrate a historical analog for requiring Illinois citizens to undergo two separate burdensome licensing processes. Defendant argues the requirements to obtain a FOID card or CCL unduly burden the right to bear arms. Applicants for a FOID card must wait up to 30 days for the Illinois State Police to process the application, pay a $10 fee, and provide personal information, finger prints, and photographs, which the police can use to verify the applicant's criminal and mental health history. Applicants for a CCL wait up to 90 days, pay a $150 fee, provide personal information, and must complete a required firearms training course which carries its own set of fees. Defendant highlights the entire process can cost up to $300 and take several months to complete.

¶ 21        The second amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. A defendant who challenges the constitutionality of a statute "carr[ies] the heavy burden of successfully rebutting the strong judicial presumption that statutes are constitutional." (Internal quotation marks omitted.) *People*

7

*v. Rizzo*, 2016 IL 118599, ¶ 23. A facial challenge to the constitutionality of a statute requires a showing that the statute is unconstitutional under any set of facts, thus, the existence of any situation where the statute could be validly applied will cause the challenge to fail. *Id.* ¶ 24. An as-applied challenge requires a showing of unconstitutionality based on a defendant's particular set of facts and circumstances. *People v. Thompson*, 2015 IL 118151, ¶ 36.

¶ 22    In *Bruen*, the Supreme Court analyzed a New York licensing scheme, which required individuals to demonstrate "proper cause" when attempting to obtain a license to carry a firearm outside the home. *Bruen*, 597 U.S. at 12-14. Those individuals had to show that they possessed a special need for self-protection separate from the general population. *Id.* at 12. In its ruling, the Court emphasized the importance of historical analysis when deciding "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 26. It also explained that individual self-defense was the heart of the right to bear arms. *Id.* at 29.

¶ 23    After reviewing the relevant history, the Court concluded New York's licensing regime violated the second amendment. *Id.* at 70. In reaching its decision, the Court noted that 43 states employed a "shall-issue" licensing regime, which requires applicants to undergo a training program or submit to a background check designed to ensure the people in their jurisdictions are law-abiding, responsible citizens. *Id.* at 38 n.9. It distinguished these regulations from the discretionary regulations enacted by New York, holding that "shall-issue" licensing regimes were not affected by its decision because they "appear to contain only narrow, objective, and definite standards guiding licensing officials, [citation], rather than requiring the appraisal of facts, the exercise of judgment, and the formation of an opinion." (Internal quotation marks omitted.) *Id.*

¶ 24    Our supreme court has explicitly held that, "[f]or the reasons expressed in *Bruen* itself, Illinois's shall-issue regime is not facially unconstitutional under the second amendment." *People*

*v. Thompson*, 2025 IL 129965, ¶ 53. *Bruen* expressly approved of firearms training programs and background checks designed to ensure the people are law-abiding and responsible, however, as defendant points out, it did not rule out the possibility that challenges may be brought against "shall-issue" regimes where abuses occur, "for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Bruen*, 597 U.S. at 38 n.9; see *People v. Gunn*, 2023 IL App (1st) 221032, ¶¶ 19, 27. We have previously found that 30 or 90 days to process applications are not lengthy, nor the respective fees exorbitant. See *People v. Noble*, 2024 IL App (3d) 230089-U, ¶ 16 (a 30-day processing window and nominal application fee do not unduly burden the right to bear arms). If any abuses occur in the processing of any given application in Illinois, those facts may give rise to an as-applied challenge, but not a facial challenge. *Thompson*, 2025 IL 129965, ¶ 50. Accordingly, defendant's facial challenge to the constitutionality of his UUW conviction fails.

¶ 25                                  C. Waiver of Trial by Jury

¶ 26        Defendant lastly contends he did not validly waive his right to a jury trial and argues, because there was never any discussion of the jury waiver in open court nor an affirmative statement made by defendant or his counsel, the record fails to demonstrate that he made a knowing and voluntary waiver of his right. This issue has been forfeited where defendant failed to raise it below, but defendant requests that we review it under the plain error doctrine.

¶ 27        The plain error doctrine permits a reviewing court to remedy a "clear or obvious error" when: (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551,

565 (2007). Defendant contends this issue is reversible under the second prong of the plain error doctrine. The first step of the plain error doctrine is to determine whether an error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 28        The right to a jury trial is a fundamental right guaranteed by the United States Constitution and the Illinois Constitution. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. A defendant may waive his right to a trial by jury, but any such waiver must be made knowingly and understandingly. *People v. Hutt*, 2023 IL 128170, ¶ 30. "Whether a waiver is knowing and understanding depends on the particular facts and circumstances of each case." *Id.* A signed waiver alone is insufficient to establish that an understanding waiver of the right to a jury trial was made, however, the presence of a signed waiver, viewed with other circumstances, "lessens the probability that the waiver was not made knowingly." *People v. Steiger*, 208 Ill. App. 3d 979, 982 (1991). "While it may be preferable for a trial court to advise a defendant of his right to a jury trial, the trial court is not constitutionally required to do so in order to maintain a valid waiver." *Id.* at 981.

¶ 29        Here, the record demonstrates before trial. the court accepted a jury waiver from defendant, confirmed the offenses, and asked if "[e]veryone [was] on the same page." The court then directed defendant to fill out a written jury waiver in open court. The court indicated it would discuss the waiver with defendant, however, if any such discussion occurred it was not included in the record. Defendant is an educated adult with prior contact with the criminal justice system. The jury waiver which defendant signed was detailed, specifically mentioning his right to be tried by a jury and his consent to be tried and sentenced before the court if convicted. We find these circumstances sufficient to constitute a valid jury trial waiver.

¶ 30   In so concluding, we reject defendant's contention that his waiver would only be valid if the record contained some affirmative statement by his attorney, in his presence, that he wished to waive his right to a jury trial. Courts have previously held that a signed jury waiver presented in open court, together with the court's mention of defendant's waiver in the presence of defense counsel and defendant constitutes an understanding waiver. See *People v. Jones*, 93 Ill. App. 3d 475, 480 (1981) (a signed jury waiver presented in open court, coupled with the court's statement that defendant had " 'previously waived his right to trial by jury,' " constituted an understanding waiver). Defense counsel and defendant's silence after the court's acceptance of his jury trial waiver and inquiry about "[e]veryone [being] on the same page," followed by the filing of a detailed jury waiver in open court are sufficient to establish an understanding waiver. Because we find no error, there can be no plain error. *Eppinger*, 2013 IL 114121, ¶ 42.

¶ 31                                    III. CONCLUSION

¶ 32   For the reasons stated, we affirm the judgment of the circuit court of Will County.

¶ 33   Affirmed.