2026 IL App (1st) 232112-U

SECOND DIVISION
February 3, 2026

No. 1-23-2112

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 22 CR 04844 |
| | ) | |
| TERRY COOKS, | ) | Honorable |
| | ) | Arthur Wesley Willis |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Affirmed. Defendant cannot establish prejudice from counsel's failure to file motion to suppress gun. Odor of burnt cannabis and defendant's apparent attempt to hide something as police approached, among other factors, established probable cause for vehicle search. Unlawful possession of weapon statute was not unconstitutional either facially or as applied to defendant.

¶ 2    A jury convicted defendant Terry Cooks of unlawful possession of a weapon by a felon (UPWF). His principal argument on appeal is that trial counsel was ineffective for failing to move to suppress the gun. The dispositive question raised by this issue is whether the police had probable cause to search the car, based primarily on their observations of the smell of burnt cannabis and defendant's apparent attempt to hide something as the police approached (along with other, albeit less significant, factors). The question is a close one, but our answer is yes.

Thus, defendant cannot establish that he was prejudiced by counsel's failure to file a suppression motion. We further hold that the UPWF statute is not unconstitutional, either on its face or as applied to defendant.

¶ 3                                    BACKGROUND

¶ 4     Chicago Police Officers David Arauz and Antonio Ramirez found a loaded handgun during a "narcotics search" of a parked Jeep. The defense did not move to suppress the gun, so the case proceeded directly to a jury trial on a UPWF charge. Officers Arauz and Ramirez were the principal witnesses. Video footage from their body worn cameras (BWCs) captured some, though not all, of the encounter. Defendant did not testify or present any evidence. His theory was that the State could not prove that he intended to exercise control over the gun. Defendant and his lead trial attorney both testified at a hearing on a post-trial motion that alleged counsel's ineffectiveness.

¶ 5                          I. Evidence of probable cause at trial

¶ 6     The search at issue took place on January 31, 2022. Around 10:30 p.m., Officers Arauz and Ramirez came across a Jeep parked in front of an auto body shop, on South State Street near 66th Place. The Jeep was parked about 12 inches, or perhaps a bit more, from a snowy curb, thus potentially obstructing the flow of traffic. Judging this to be a traffic violation, Ramirez pulled up alongside the Jeep for a closer look.

¶ 7     The officers testified that from inside the squad car, they could see defendant making "furtive" movements in the driver's seat of the Jeep. Specifically, he shifted from side to side, pulled his lower body up and away from the seat, and then sat back down. There was one other

- 2 -

unidentified passenger in the Jeep, sitting in the front seat. As far as the officers could see, he was not moving. But the officers acknowledged that they could not see either occupant's hands.

¶ 8    The officers' BWCs were on (though muted) at the time, but since the officers were still seated in the squad car, the cameras were trained on the squad car's dashboard. As a result, the footage does not depict defendant's "furtive" movements.

¶ 9    The officers parked, walked over to the Jeep, and asked the two men to roll down their windows. Arauz was at the driver's side window, addressing defendant; Ramirez was at the passenger's side. With the windows down, the officers immediately noticed, and inquired about, the strong odor of burnt cannabis inside the Jeep. According to Ramirez, the passenger said that he had just smoked cannabis, or had smoked earlier, or something along those lines. (When the audio on Ramirez's BWC turns on, shortly after this interchange began, the passenger can be heard saying something like, "I smoke weed," but the recording is somewhat indistinct.) For his own part, defendant said that he did not smoke at all.

¶ 10    The officers decided to conduct a "[n]arcotics search" of the Jeep. As Ramirez elaborated on the point, "Wanted to make sure they were smoking, possession of cannabis, properly being transported." So they asked defendant and the passenger to step out. The passenger complied.

¶ 11    Defendant did not, at least not at first. Instead, he tried to roll up his window. As he did, Arauz grabbed hold of his arm and held it, straddling the window, and thus forcing defendant to stop rolling it up, lest he close it on his own arm. With his other hand, Arauz opened the driver's side door himself and again told defendant to step out. This time he did. Outside the Jeep, a quick frisk of defendant yielded nothing. Defendant and his passenger were handcuffed while

Arauz and Ramirez searched the front seats and the surrounding areas.

¶ 12    Ramirez promptly found a holster in the glove compartment, and quickly after that, Arauz felt a hard, L-shaped bulge underneath a loose-fitting seat cover on the driver's seat. He reached under the seat cover and found a loaded handgun. There was no evidence that the police found any cannabis, cannabis residue, or cannabis paraphernalia in the car. Nor was there any evidence that defendant was, or appeared to be, impaired.

¶ 13                    II. Post-trial motion alleging counsel's ineffectiveness

¶ 14    After defendant was convicted, he retained new counsel and pursued various claims of ineffective assistance in a post-trial motion. Among other claims no longer at issue, the post-trial motion alleged that trial counsel should have moved to suppress the gun because the police lacked probable cause to search the Jeep.

¶ 15    At a hearing on the motion, lead trial counsel testified that he had "internal discussions about a motion to suppress" with his associate, who "handled the day to day" management of the case up until trial. Based on those discussions, and "after reviewing the reports in the case and watching the video," lead trial counsel "had a view about the motion to suppress," which he communicated to defendant. Counsel did not, and was not asked to, elaborate any further on this point. Defendant testified that when discussing a possible motion to suppress, his attorneys told him, " 'We don't need it.' "

¶ 16    During his testimony, lead counsel was shown a text message that he sent to a member of defendant's family, in which he evidently discussed a potential motion to suppress. The message is not available in the record, but the State described it during the argument on the motion below.

In response to the court's question whether a motion to suppress would have been based solely on the smell of cannabis, the State answered no, noting that in the text message, counsel is "not only citing the smell of cannabis, but he's also citing the movements by the Defendant and everything else." As the State said elsewhere of this text message, defense counsel "determined, in his experience, that [a motion to suppress] would have been a waste of the Court's time because he saw it as a loser."

¶ 17    The trial court found that a motion to suppress would not have been "meritorious," since the police had probable cause to search the Jeep based on "a number of things in conjunction"— most importantly, the smell of burnt cannabis and defendant's "furtive" movements. The court then added, with no real explanation, that counsel decided not to file a motion to suppress as a matter of "trial strategy." Defendant was sentenced to six years in prison for UPWF.

¶ 18                                        ANALYSIS

¶ 19                                  I. Ineffective assistance

¶ 20    Defendant's ineffective-assistance claim lingers as his lead appellate issue. Because the police lacked probable cause to search the Jeep, he argues, trial counsel should have moved to suppress the gun that the officers discovered during their ostensible search for cannabis.

¶ 21    Defendant's claim is governed by the familiar deficiency-and-prejudice framework of *Strickland v. Washington*, 466 U.S. 668 (1984). He must establish both deficient performance and prejudice; if his claim of prejudice fails, we can dispose of his ineffectiveness challenge on that basis alone. *People v. Simpson*, 2015 IL 116512, ¶ 35. To establish prejudice, based on counsel's failure to file a motion to suppress, defendant must show (1) that the proposed motion

was "meritorious," meaning that it "would have succeeded;" and (2) a reasonable probability that he would have been acquitted had the evidence been suppressed. *People v. Henderson*, 2013 IL 114040, ¶¶ 12, 15; *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

¶ 22    One preliminary point. The State claims that counsel's decision not to file a suppression motion was a "strategic decision," because lead counsel testified that he considered and discussed a potential motion with his associate. The State thus invites us to summarily dispose of defendant's claim on the ground that he is attacking counsel's "trial strategy."

¶ 23    The State makes far too much of counsel's hedged and ambiguous testimony. Counsel never claimed that he took a pass on a suppression motion as part of his considered trial strategy. Recall that the strategy at trial was to pin control and thus possession of the gun on defendant's passenger. There is no evident reason why first trying to suppress the gun would have undercut this strategy, and if counsel perceived some such reason that is not apparent to us, he certainly did not say so on the witness stand. His testimony that he "had a view" about a potential motion says nothing of the kind; in fact, it is so non-specific that is says nothing at all. Defendant's own testimony, that his attorneys said he "didn't need" a motion to suppress, is perhaps a modestly better launching point for the State's argument, but in the end, it is also too ambiguous to support any clear inferences about counsel's reasoning.

¶ 24    And in the text message described by the State, lead counsel appears to say that the police had more than just the smell of burnt cannabis to go on. Taking the State's description of the text message at face value, it thus appears that counsel's "view" was about the *legal merits* of the proposed motion—namely, that it would have lost, because the police had probable cause for the

search. That is not a "strategic decision" that demands deference, or a presumption of soundness, under *Strickland*. It is a purely legal determination, based on an application of fourth-amendment principles. At the risk of belaboring the obvious, courts do not defer to counsel on legal, much less constitutional, questions.

¶ 25 Simply put, defendant had absolutely nothing to lose by filing a motion to suppress, even if counsel thought it was unlikely to succeed. It makes no difference that the defense theory at trial would be to blame the passenger for the presence of the gun. If the fruits of the search—the gun—were suppressed, there wouldn't *be* a trial; the State could not possibly prosecute a gun-possession case without evidence that the defendant possessed a gun.

¶ 26 Because there was no clear evidence of a strategic decision offered at the hearing, "trial strategy" is not a basis for resolving defendant's claim. The real question, and the only one we need answer, is prejudice, which boils down to the question of probable cause. This is surely an arguable issue, and even a somewhat close call. That said, defendant's burden is a demanding one: he must show that counsel failed to file nothing short of a *winning* suppression motion. *Henderson*, 2013 IL 114040, ¶¶ 12, 15. And he falls short of that mark.

¶ 27 A warrantless automobile search is permissible, under the fourth amendment, if it is based on probable cause. *People v. Redmond*, 2024 IL 129201, ¶ 24; *Carroll v. United States*, 267 U.S. 132, 156 (1925). Probable cause exists when the evidence known to the officer(s) raises a "fair" or "reasonable" "probability that contraband or evidence of a crime will be found in a particular place." (Internal quotation marks omitted.) *Redmond*, 2024 IL 129201, ¶ 26. This standard does not require certainty or proof beyond a reasonable doubt, so it does not require the

officer(s) to "rule out any innocent explanations for suspicious facts." (Internal quotation marks omitted.) *Id.* Probable cause is a highly "factual" inquiry, governed by "practical" and "commonsense considerations," as seen from the perspective of an "objectively reasonable" officer. (Internal quotation marks omitted.) *Id.*

¶ 28     The search at issue here took place after our legislature legalized the possession and use of recreational cannabis, subject to certain restrictions. See *Redmond*, 2024 IL 129201, ¶¶ 40-43; *People v. Molina*, 2024 IL 129237, ¶¶ 36-45. When cannabis was illegal contraband, full stop, the smell of raw or burnt cannabis in a car was enough to establish probable cause for a search. *People v. Stout*, 106 Ill. 2d 77, 88 (1985). That rule had to be reconsidered when cannabis was decriminalized (see *People v. Hill*, 2020 IL 124595), and again when it was legalized. Our supreme court settled the post-legalization principles of probable cause in *Redmond*, 2024 IL 129201, ¶¶ 45-54, and *Molina*, 2024 IL 129237, ¶¶ 52-61. Together, these decisions hold that the smell of *raw* cannabis alone provides probable cause for a vehicle search, but the smell of *burnt* cannabis alone does not, although it is a factor that contributes to probable cause.

¶ 29     Defendant's case was pending on appeal when our supreme court decided *Redmond* and *Molina*. This timing might seem significant at first blush, because the probable-cause inquiry in this case arises within the context of a *Strickland* claim, and in deciding whether counsel was ineffective, we apply the law as it stood at the time of the challenged action or decision. *People v. Bailey*, 232 Ill. 2d 285, 299 (2009); *People v. Rowell*, 2021 IL App (4th) 180819, ¶ 29. But as it turns out, the law that would have applied to a pre-trial suppression motion was, in essentials, the same law that we have now, after our supreme court's rulings in *Redmond* and *Molina*.

¶ 30    That is largely because the appellate decisions in *Redmond*, 2022 IL App (3d) 210524, and *Molina*, 2022 IL App (4th) 220152, were issued during defendant's pre-trial proceedings. Our supreme court later affirmed both of these appellate decisions and accepted the key aspects of their reasoning. The appellate decision in *Redmond* relied on *People v. Stribling*, 2022 IL App (3d) 210098, ¶ 29, which similarly held that the smell of burnt cannabis in a car does not provide probable cause to search a vehicle in the absence of other corroborating factors.

¶ 31    The First District had not yet considered the effect of legalization on probable cause for a vehicle search. So too for the Fifth District. It is true, as the State points out, that the Second District disagreed with *Stribling* and *Redmond* and held that the smell of burnt cannabis alone continued to provide probable cause for a vehicle search. *People v. Harris*, 2023 IL App (2d) 210697, ¶¶ 23-32. Defendant's proposed motion would not have stood a chance under *Harris*. And if the trial court had been forced to choose between *Harris*, on the one hand, and *Stribling* and *Redmond* on the other, defendant's motion would have faced uncertain prospects, at best, under a conflicted body of law. The State would have us reject defendant's claim on this basis alone. But the State's argument ignores the fact that defendant stood trial before *Harris* was decided. Truth be told, the appellate law was uniform, not conflicted, when a suppression motion would have been filed in this case.

¶ 32    If that motion had been filed, the trial court would have been bound to apply the existing appellate decisions that expressly considered the effect of legalization on probable cause for a vehicle search. See *State Farm Fire & Cas. Co. v. Yapejian*, 152 Ill. 2d 533, 539 (1992) ("A decision of the appellate court, though not binding on other appellate districts, is binding on the

circuit courts throughout the State.") And to be clear, there were three such decisions: *Stribling* and the appellate decisions in *Redmond* and *Molina*.

¶ 33    These appellate rulings thus provide the legal context, and a uniform body of precedent, for assessing defendant's *Strickland* claim. Indeed, it bears emphasis that our supreme court's subsequent decisions put a final stamp of approval on exactly this body of appellate case law. So for all practical purposes, defendant's *Strickland* claim is governed by the current principles of probable cause to search a vehicle for cannabis. Thus, we will freely cite our supreme court's later-issued decisions in *Redmond* and *Molina*, where it proves helpful and convenient to do so, for the authoritative explanations they provide of the issues that arise here.

¶ 34    That brings us to the dispositive question of probable cause. There is no dispute that the officers smelled a "strong odor of burnt cannabis" when defendant and his passenger rolled down the front windows of the Jeep. Post-legalization, the smell of burnt cannabis alone does not give rise to probable cause for a vehicle search, but it is a factor that can contribute to probable cause. *Redmond*, 2024 IL 129201, ¶¶ 45-54; *Redmond*, 2022 IL App (3d) 210524, ¶¶ 21-22; *Stribling*, 2022 IL App (3d) 210098, ¶ 29.

¶ 35    A probable-cause analysis requires an "analysis of the facts known to the officers in relation to the crime suspected." *Redmond*, 2024 IL 129201, ¶ 51. So the first step is to identify the potential offense(s) that the police actually suspected or, objectively speaking, had reason to suspect. The only candidate offense identified in the State's appellate brief is the Vehicle Code's requirement that any cannabis possessed "in a motor vehicle" must be stored in a "sealed, odor-proof, child-resistant cannabis container." 625 ILCS 5/11-502.1, 502.15 (West 2020).

¶ 36    The smell of *raw* cannabis reliably indicates that cannabis is present and, obviously enough, is not in an "odor proof" container. *Molina*, 2024 IL 129237, ¶ 55. That is why the smell of raw cannabis alone provides probable cause for a vehicle search. *Id.* ¶¶ 52-56; *Molina*, 2022 IL App (4th) 220152, ¶¶ 38-44. But the officers here never claimed to smell raw cannabis, only burnt cannabis. The State thus fails to identify a plausible candidate offense that the officers had probable cause to investigate.

¶ 37    That said, the burden on a *Strickland* claim lies with defendant, not the State. And a plausible candidate offense is not far to seek. While the smell of raw cannabis gives rise to an inference of current possession, the smell of *burnt* cannabis gives rise to an "inference of current or prior use." *Molina*, 2024 IL 129237, ¶ 56. And even post-legalization, there are still numerous restrictions on when, where, and by whom cannabis can lawfully be used.

¶ 38    In the context of automobiles, there are two sources of such restrictions: the Vehicle Code, and section 10-35 of the Cannabis Regulation and Tax Act. 410 ILCS 705/10-35 (West 2020) ("Regulation Act").

¶ 39    First, the Vehicle Code provides that "[n]o driver may use cannabis within the passenger area of any motor vehicle upon a highway in this State." 625 ILCS 5/11-502.15(a) (West 2020). For this purpose, a "highway" is defined, in short, as any public way. *Id.* § 1-126 ("highway" means "[t]he entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel ***"). There is no dispute that the Jeep, parked on South State Street in Chicago, was on a "highway" as thus defined.

¶ 40    Second, by way of background, the legalization of cannabis has the following overall legal structure. Section 4 of the Cannabis Control Act establishes a general prohibition against the possession of cannabis. 720 ILCS 550/4 (West 2020) ("Control Act"). Section 10-5 of the Regulation Act "then generally grants immunity from prosecution for the use and possession of cannabis." *Redmond*, 2024 IL 129201, ¶ 58; 410 ILCS 705/10-5 (West 2020). Section 10-35 of the Regulation Act, in turn, "describes conduct for which section 10-5 does not apply;" conduct that falls under section 10-35 therefore remains subject to the Control Act's general prohibition against the possession of cannabis. *Redmond*, 2024 IL 129201, ¶ 58. Thus, someone who uses or possesses cannabis in the ways described in section 10-35 commits a civil, misdemeanor, or felony offense, depending on the quantity of cannabis involved.

¶ 41    Per section 10-35, the Regulation Act "does not permit any person to engage in" certain enumerated conduct, which includes "using cannabis *** in any motor vehicle." 410 ILCS 705/10-35(a)(3)(D) (West 2020). This prohibition is significantly broader than the Vehicle Code provision, since it is not limited to the driver of the vehicle, and it does not require the vehicle to be on a public way when the cannabis is used.

¶ 42    So our question, in sum, is whether the police had probable cause to search the Jeep for evidence that defendant and/or his passenger *used* cannabis *in the Jeep*, in violation of one or both of these provisions.

¶ 43    The smell of burnt cannabis was *some* evidence of a potential violation, which is why it remains a factor in a probable-cause analysis. But the burnt smell alone was not enough for probable cause. Because the smoke-borne odor created by the burning of cannabis tends to waft

and "linger[ ]," one cannot reliably infer when, where, or by whom the cannabis was used just from the presence of the burnt smell alone. *Stribling*, 2022 IL App (3d) 210098, ¶ 28; *Redmond*, 2024 IL 129201, ¶ 47.

¶ 44    For all the officers here could have known, based on what they smelled, defendant and/or his passenger could have smoked cannabis, in a permissible location, before getting into the Jeep. And since there was no evidence that defendant was impaired as a result, the possibility of cannabis use outside the Jeep did not give rise to probable cause for a search. See *Stribling*, 2022 IL App (3d) 210098, ¶ 28 (driver's potential use of cannabis not unlawful if it does not result in actual impairment or blood/urine concentrations over threshold amount).

¶ 45    Probable cause thus requires further "corroborating factors" or "inculpatory facts," which is to say: some more particularized evidence making it reasonably likely that cannabis was used in a certain prohibited context—namely, in the Jeep. *Redmond*, 2024 IL 129201, ¶ 54; *Redmond*, 2022 IL App (3d) 210524, ¶ 22; *Stribling*, 2022 IL App (3d) 210098, ¶ 29.

¶ 46    Actual smoke, either inside the Jeep or wafting out of its windows, would have provided the corroboration necessary for probable cause. But there was no evidence of any smoke. Nor did the officers claim to see ash, residue, paraphernalia, or any other such indication of cannabis use in the Jeep. (And for what it's worth, they did not find any during the search.)

¶ 47    The fact that defendant may have parked slightly too far from the curb is not a reason to suspect that someone smoked cannabis at all, much less inside the Jeep. See *Stribling*, 2022 IL App (3d) 210098, ¶ 28 (traffic violations not inherently indicative of impairment or substance use). So defendant's ostensible parking violation was not, as the State argues, a corroborating

factor that contributed to probable cause for the search.

¶ 48     Of the potentially corroborating factors that remain, the most significant is defendant's "furtive" movements, which the officers claimed to see as they approached the Jeep in the squad car, before the BWCs began to capture the relevant events. In ruling on the post-trial motion, the trial court clearly credited the officers' testimony on this point, and we defer to that finding.

¶ 49     To be clear, the officers did not baldly characterize defendant's movements as "furtive," which is nothing more than a synonym of "suspicious" and therefore does nothing to explain the *basis* for the officers' claimed suspicions. Rather, the officers gave a detailed description of what they saw: defendant shifted from side to side, pulled his lower body up and away from the seat, and then sat back down. We would add that the officers were in a marked squad car with flashing lights, and their side lamps were turned on to illuminate the Jeep. So it would have been clear to defendant that it was, in fact, the police approaching. The officers left the obvious inference from these facts unspoken, but the State draws it in its brief: defendant looked like he was hiding something, either in or underneath his seat, from the approaching police.

¶ 50     "Furtive" movements, thus described, are not enough for probable cause. See, *e.g.*, *People v. Randall*, 2022 IL App (1st) 210846, ¶ 37. There are countless lawful items that defendant, out of legitimate concern for his privacy, had every right to hide from the view of two perfect strangers. Generally speaking, it is also possible that someone shuffling about in this way was not trying to hide something at all, but rather reaching for his wallet, on the premise that he would soon need to show his license to the police. But defendant appeared to be doing just that at a later point, as seen on the BWC, and the officers explicitly testified that these later movements

were *not* the "furtive" ones they were acting on.

¶ 51　In any event, like the smell of burnt cannabis, an effort to hide something from the police is a factor that can give rise to probable cause when other corroborating factors are present. See *id.* In particular, there must be some other evidence that the item being hidden is sufficiently likely to be contraband, or evidence of a crime, rather than something lawful but private.

¶ 52　Here, the smell of burnt cannabis and defendant's apparent effort to hide something from the police were mutually corroborating. The smell of burnt cannabis made it reasonably likely that defendant was trying to hide evidence of recent cannabis use. His attempt to hide something from the police, in turn, made it reasonably likely that the smell of burnt cannabis in the Jeep was the result of imminent use in that very location.

¶ 53　Further, albeit slight, corroboration is provided by the passenger's statement to Officer Ramirez. On the BWC, the passenger can be heard saying something about using cannabis. We cannot tell exactly what he was saying, but as Ramirez recalled, the passenger said he had "just" smoked cannabis, or something to that effect. Granted, the passenger did not admit that he had smoked *in the Jeep*; and defendant, for his own part, denied that he smoked at all. Still, this was what the police knew: one occupant of the Jeep (the passenger), by his own admission, recently used cannabis, and the other (defendant) seemingly tried to hide something from the approaching police. And that is to say nothing of defendant's initial noncompliance when the officers ordered him out of the Jeep for the search.

¶ 54　All these factors, taken together, demonstrated a "fair" or "reasonable probability" that a search of the Jeep would yield evidence of unlawful activity—cannabis use inside the Jeep by

one or both occupants. See *Redmond*, 2024 IL 129201, ¶ 26; *Molina*, 2024 IL 129237, ¶ 22. The officers had probable cause for the search.

¶ 55 These corroborating factors, beyond the mere smell of burnt cannabis, distinguish this case from *Redmond*, 2022 IL App (3d) 210524, and *Stribling*, 2022 IL App (3d) 210098, which both found that probable cause for a vehicle search was lacking.

¶ 56 In *Redmond*, 2022 IL App (3d) 210524, ¶ 22, the search was based entirely on the smell of burnt cannabis in the car, with no corroborating factors at all. We noted that the defendant in *Redmond*, unlike our defendant here, "did not make any furtive movements." *Id.* ¶ 3. Nor was there any evidence of noncompliance. See *id.* What's more, the officer in *Redmond* affirmatively believed that the smell of burnt cannabis alone gave rise to probable cause. *Id.* ¶ 8. Thus hemmed in by his own error, he could only resort to a series of non-starters in his effort to justify the illegal search: the defendant was driving (1) a rental car (2) on I-80, a supposed drug-trafficking corridor, (3) between Chicago and Des Moines, Iowa, two supposed hubs of criminal activity. Clearly there was nothing but the smell of burnt cannabis to go on.

¶ 57 In *Stribling*, 2022 IL App (3d) 210098, ¶ 27, the smell of burnt cannabis, combined with the defendant's traffic offense(s) and statement to the officer, did not support probable cause. As we noted above, traffic offenses are commonplace events that do not reliably indicate substance use, much less use in a prohibited context, or any other likely unlawful activity. So the only potentially corroborating factor was the defendant's admission to the officer that "someone had smoked inside the vehicle 'a long time ago.' " *Id*. And that admission was not enough.

¶ 58 Unlike defendant's passenger here, the defendant in *Stribling* (who was alone in the car)

did not admit to an imminent or at least *recent* use of cannabis by a *current* occupant of the car. The fact that someone, at some point, smoked cannabis in the car could very well explain the "linger[ing]" smell (*id.* ¶ 28), without thereby indicating that the police were reasonably likely to find evidence of an offense during a search. The passenger's admission here thus provided the police with a stronger reason to believe that cannabis was recently used, and that evidence of this offense was likely to be found, in the Jeep.

¶ 59    Last but surely not least, like the defendant in *Redmond* but unlike our defendant here, the defendant in *Stribling* was not trying to "hid[e] anything" from the police. *Id*.

¶ 60    Given the state of the law during defendant's pre-trial proceedings, a motion to suppress was surely arguable, but it was not "meritorious" under the strict standard required to establish *Strickland* prejudice. Defendant has thus failed to show that trial counsel was ineffective for failing to move to suppress the gun found during the search of the Jeep.

¶ 61                              II. Constitutionality of UPWF statute

¶ 62    Defendant also claims that the UPWF statute violates the Second Amendment under the test established in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). He raises both facial and as-applied challenges under the *Bruen* framework. Neither challenge was raised below. But for the following reasons, we consider—and reject—both.

¶ 63    We begin with the facial challenge to the UPWF statute. Facial challenges may be raised at any time, even for the first time on appeal. *People v. Thompson*, 2015 IL 118151, ¶ 32. This particular challenge takes us into well-worn territory, so we have the luxury of being brief. The *Bruen* test proceeds in two steps: we first ask whether "the Second Amendment's plain text

- 17 -

covers an individual's conduct;" if it does, the State "must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

¶ 64    We should note at the outset that, after the close of briefing, our supreme court released its opinion in *People v. Thompson*, 2025 IL 129965. *Thompson* involved a conviction for AUUW, which prohibits possession of a firearm without a concealed-carry license. See 720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2024). Our supreme court viewed the issue as a challenge to "the constitutionality of the AUUW statute's enforcement of the CCL licensing regime, which incorporates FOID card licensure." *Thompson*, 2025 IL 129965, ¶ 17. The court held that footnote 9 in *Bruen* expressly endorsed Illinois's shall-issue licensing scheme and "obviate[d] the need for this court to apply the historical-tradition component of the *Bruen* analysis to defendant's facial challenge" to the AUUW provision at issue. *Id.* ¶ 44.

¶ 65    But *Thompson* does not govern our analysis, as this appeal does not involve either the FOID Card Act or the Firearm Concealed Carry Act. Defendant here was convicted based on his status as a felon, not his lack of a firearm license. See *People v. Delgado*, 2025 IL App (1st) 240350-U, ¶ 13 (noting that *Thompson* did not govern its consideration of facial challenge to UPWF statute for this reason).

¶ 66    That aside, the cases thus far have reached conflicting conclusions about *Bruen*'s threshold inquiry. Some hold that felons are categorically excluded from the Second Amendment's protections, while others hold that a felon's possession of a firearm falls within the scope of the amendment and thus warrants an historical inquiry under the second step of the

*Bruen* test. Compare *People v. Baker*, 2023 IL App (1st) 220328, ¶ 37 (because felons are not "law abiding citizens," they are not protected by the Second Amendment, and *Bruen*'s historical-tradition analysis "does not apply" to them), with *Brooks*, 2023 IL App (1st) 200435, ¶¶ 88-89 ("How the defendant's prior felony might impact his second amendment right to possess a firearm is more properly evaluated under the second step's historical tradition analysis.").

¶ 67    We need not decide which step of the *Bruen* analysis is the more suitable one, for even if defendant falls within the scope of the amendment's protections and thus satisfies the analysis under step one of *Bruen*, his argument would fail under *Bruen*'s historical-tradition analysis. That is, laws that prohibit felons from possessing firearms are generally consistent with our historical tradition of firearm regulation. See *Brooks*, 2023 IL App (1st) 200435, ¶¶ 88-89.

¶ 68    We have undertaken the historical analysis required by *Bruen* in several previous cases, and we will not repeat it all here. A case directly on point is *People v. Travis*, 2024 IL App (3d) 230113, ¶¶ 27-33, which rejected facial challenges to the armed habitual criminal (AHC) and unlawful use of a weapon by a felon (UUWF; since renamed UPWF) statutes, on the ground that these firearm prohibitions are consistent with our historical tradition.

¶ 69    And for a sampling of appellate cases from the various districts that agree with this analysis, see *People v. Stephens*, 2024 IL App (5th) 220828, ¶¶ 34-39 (rejecting facial challenge to UUWF statute under second step of *Bruen*); *Brooks*, 2023 IL App (1st) 200435, ¶¶ 68-101 (rejecting as-applied challenge to AHC statute, finding prohibition on firearm possession by non-violent felon consistent with historical tradition); *Awkerman v. Illinois State Police*, 2023 IL App (2d) 220434, ¶¶ 49-56 (rejecting as-applied challenge to FOID Act provisions that permit denial

of FOID card based on applicant's conviction for felony drug offense).

¶ 70    We agree that the historical analysis set forth in these cases satisfies the second step of the *Bruen* test and is thus sufficient to dispose of defendant's facial challenge to the UPWF statute. We respectfully decline his invitation to reconsider these rulings.

¶ 71    That leaves defendant's as-applied challenge. His argument, as we understand it, can be summed up as follows. The predicate conviction for his current UPWF charge is an aggravated discharge of a firearm committed in 2004, roughly 18 years before he was arrested for possessing a gun as a felon. By then, he was no longer "under felony sentence or on mandatory supervised release." Even granting that *some* firearm disability could constitutionally result from this particular predicate offense, it could not last *this* long, since there is no historical analogue for a ban of this scope. And given that his only other prior felony—possession of burglary tools in 2007—was "of a similar vintage," and non-violent to boot, his criminal history as a whole does not support a "finding of current dangerousness" that would justify a continued firearm disqualification.

¶ 72    This is, in essentials, the same as-applied challenge that we considered in *People v. Boss*, 2025 IL App (1st) 221855. The defendant in *Boss* argued, for the first time on appeal, that the UUWF statute was unconstitutional as applied to him, because he had served his full sentence for his armed-robbery predicate by the time he was arrested, and the State produced no other evidence demonstrating that he remained dangerous. *Id.* ¶¶ 38-41.

¶ 73    The lead opinion in *Boss* held that the challenge was "premature." *Id.* ¶ 42. As-applied challenges are generally "premature"—which is to say, forfeited—if they were not raised in the

trial court, where a record of the specific facts and circumstances relevant to the claim can be developed at an evidentiary hearing. *People v. Thompson*, 2015 IL 118151, ¶ 37. In *Boss*, 2025 IL App (1st) 221855, ¶ 41, the trial court never received any evidence "concerning the facts and circumstances surrounding [the] defendant's prior conviction," among other matters that could bear on the question of his "dangerousness." Without this evidence, the lead opinion concluded, the appellate court could not properly review the defendant's as-applied challenge, dependent as it was on the particulars of his situation; a postconviction petition would be necessary. *Id.*

¶ 74 The special concurrence in *Boss* reached a different conclusion: the as-applied challenge was not legally viable, *whatever* the particular facts may be, under either application of the *Bruen* framework articulated in our cases. *Id.* ¶¶ 60-62 (Mikva, P.J., specially concurring).

¶ 75 Justice Mikva's special concurrence is persuasive; under either step of *Bruen*, an as-applied challenge is doomed from the start. Under the first approach, as discussed, felons are excluded from the scope of the second amendment. If they have no second-amendment rights, they obviously have no viable second-amendment challenges, either facial or as-applied. *Id.* ¶ 60.

¶ 76 Under the second approach, laws that prohibit felons from possessing firearms are generally consistent with our historical tradition of firearm regulation. *Id.* ¶ 61. Specifically, we have held in this context that firearm disqualifications based on felony status are (historically and thus constitutionally) justified, even if they are "permanent" (*Stephens*, 2024 IL App (5th) 220828, ¶¶ 10, 21, 25) or arise from non-violent predicate offenses (*Brooks*, 2023 IL App (1st) 200435, ¶ 100). And if firearm disqualifications can be based on non-violent felony offenses, it follows that a particularized showing of "dangerousness" is not required.

¶ 77    Justice Mikva's point is well-taken: the as-applied challenge was foreclosed as a matter of law. Under either approach to the *Bruen* framework, there was no need for an individualized finding that the defendant posed a danger to society, and thus no need for a hearing or other inquiry into the details of his felonies. *Boss*, 2025 IL App (1st) 221855, ¶¶ 60, 62 (Mikva, P.J., specially concurring). Simply put, the as-applied challenge fails here for the same reasons as the facial challenges we have rejected in a myriad of cases. *Id.* ¶ 62.

¶ 78    Finally, even if, for the sake of argument, a particularized finding of dangerousness was necessary for a justified firearm disqualification, we have everything in the record below to determine that defendant's as-applied challenge lacks merit. Unlike in *Boss*, we have more than just the names and dates of defendant's prior felonies. We know the particular facts and circumstances of his 2004 aggravated-discharge conviction, because the State introduced these details as aggravation at sentencing.

¶ 79    The fact that defendant's predicate offense was, itself, an act of *gun* violence would already go a long way toward defeating his as-applied challenge. And this particular act of gun violence was, so to speak, aggravated twice over. The State's undisputed proffer showed that defendant shot at an occupied van. The driver of the van was a witness against defendant in a pending misdemeanor case, and there was a judicial finding, in the 2004 case, that defendant's motive for the shooting was to intimidate the witness. The shooting thus implicates the judiciary's compelling interest in securing the integrity of its process and the safety of the witnesses who participate in that process. And to make matters worse, the witness's three young children were in the van with him, thus showing defendant's willingness to endanger the safety

of children, as well as intimidate witnesses, through an overt act of gun violence. We reject his implicit suggestion that details like these are immaterial, such that the passage of time alone is a sufficient reason to declare that he is not, or is no longer, a danger with a gun. So even if some as-applied challenges of this kind could ultimately prove successful, we are confident that this particular challenge is not among them.

¶ 80                                         CONCLUSION

¶ 81     The judgment of the circuit court is affirmed.

¶ 82     Affirmed.